# AUTOMATIC CANTEEN COMPANY OF AMERICA *v.* FEDERAL TRADE COMMISSION.

No. 89.   Argued December 12, 15, 1952.—Decided June 8, 1953.

*Edward F. Howrey* argued the cause for petitioner. With him on the brief were *L. A. Gravelle, Emil N. Levin* and *Elmer M. Leesman.*

*Robert B. Dawkins* argued the cause for respondent. With him on the brief were *Solicitor General Cummings, W. T. Kelley* and *James E. Corkey.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The Robinson-Patman Act, directed primarily against sellers who discriminate in favor of large buyers, includes a provision under which proceedings may be had against buyers who knowingly induce or receive discriminatory prices. That provision, § 2 (f) of the Act, is here for construction for the first time as a result of a complaint issued by the Federal Trade Commission against petitioner, a large buyer of candy and other confectionary products for resale through 230,000-odd automatic vending machines operated in 33 States and the District of Columbia. Petitioner, incorporated in 1931, has enjoyed rapid growth and has attained, so we are told, a dominant position in the sale of confectionary products through vending machines.

The Commission introduced evidence that petitioner received, and in some instances solicited, prices it knew were as much as 33% lower than prices quoted other purchasers, but the Commission has not attempted to show that the price differentials exceeded any cost savings that sellers may have enjoyed in sales to petitioner. Petitioner moved to dismiss the complaint on the ground that the Commission had not made a prima facie case. This motion was denied; the Commission stated that a prima facie case of violation had been established by proof that the buyer received lower prices on like goods than other buyers, "well knowing that it was being favored over competing purchasers," under circumstances where the

requisite effect on competition had been shown. The question whether the price differentials made more than due allowance for cost differentials did not need to be decided "at this stage of the proceeding." On petitioner's failure to introduce evidence, the Commission made findings that petitioner knew the prices it induced were below list prices and that it induced them without inquiry of the seller, or assurance from the seller, as to cost differentials which might justify the price differentials. The Commission thereupon entered a cease and desist order. 46 F. T. C. 861. On review, the Court of Appeals affirmed,[1] holding that the Commission's prima facie case under § 2 (f) does not require showing absence of a cost justification. 194 F. 2d 433.

Section 2 (f) of the Robinson-Patman Act, roughly the counterpart, as to buyers, of sections of the Act dealing with discrimination by sellers, is a vital prohibition in the enforcement scheme of the Act. In situations where buyers may have difficulty in proving their sellers' costs, § 2 (f) could, if the Commission's view in this case prevails, become a major reliance for simplified enforcement of the Act not only by the Commission but by plaintiffs suing for treble damages. Such enforcement, however, might readily extend beyond the prohibitions of the Act and, in doing so, help give rise to a price uniformity and rigidity in open conflict with the purposes of other antitrust legislation. We therefore thought it necessary to grant certiorari. 344 U. S. 809.

---

[1] The Court also granted enforcement of the order on a cross-petition by the Commission. The Commission concedes the impropriety of this action under our decision in *Federal Trade Commission* v. *Ruberoid Co.,* 343 U. S. 470, rendered after the decision of the Court of Appeals in the case now before us. In view of this concession, we assume that the Court of Appeals, on the remand of this case, will, without further direction, reconsider its order for enforcement.

Enforcement of the Clayton Act's original declaration against price discrimination was so frustrated by inadequacies in the statutory language that Congress in 1936 enacted the sweeping amendments to that Act contained in what is known as the Robinson-Patman Act. 49 Stat. 1526, 15 U. S. C. § 13. Chief among the inadequacies had been express exemption of price discrimination in the sales of different quantities of like goods, an exemption that was interpreted as leaving quantity-discount sellers free to grant discounts to quantity buyers that exceeded any cost savings in selling to such buyers. *Goodyear Tire & Rubber Co. v. F. T. C.,* 101 F. 2d 620. In an effort to tighten the restriction against price discrimination inimical to the public interest, Congress enacted two provisions bearing on the issues in this case.[2] It made price discrimination in the sale of like goods unlawful without regard to quantity, although quantity discounts, like other price differentials, could still be jus-

---

[2] The two prohibitions are as follows:

"SEC. 2. (a) That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: . . . .

[The other provisos of § 2 (a), not relevant here, concern the grant of authority to the Commission to establish quantity limits, recogni-

tified if they made no more than "due allowance" for cost differences in sales to different buyers. Congress in addition sought to reach the large buyer, capable of exerting pressure on smaller sellers, by making it unlawful "knowingly to induce or receive a discrimination in price which is prohibited by this section."

Since precision of expression is not an outstanding characteristic of the Robinson-Patman Act, exact formulation of the issue before us is necessary to avoid inadvertent pronouncement on statutory language in one context when the same language may require separate consideration in other settings. Familiar but loose language affords too ready a temptation for comprehensive but loose construction. We therefore think it imperative in this case to confine ourselves as much as possible to what is in dispute here.

We are here asked to settle a controversy involving simply the burden of coming forward with evidence under § 2 (f) of the Act. The record, so abundant in its instances of individual transactions that the Commission itself felt bound to animadvert on undue proliferation of the evidence by Government lawyers,[3] may be taken as

tion of the seller's right to select his customers under certain conditions, and exemption of price changes made in response to changing market conditions.]

.     .     .     .     .

"(f) That it shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section."

[3] The Commission recognized the need, common in antitrust litigation, for care on the part of the prosecuting officers not to overburden the record. "The record in this case does not disclose the reason for such a plethora of cumulative evidence as was adduced by Government counsel in the instant matter. Neither harassment of litigants nor the waste of Government funds in needless reiteration through cumulative evidence should be countenanced, nor does it seem that it was necessary to name 14 sellers as typical of a group from

presenting varying degrees of bargaining pressure exerted by a buyer on a seller to obtain prices below those quoted other purchasers. In some instances, so the Commission found, petitioner's method was to "inform prospective suppliers of the prices and terms of sale which would be acceptable to [petitioner] without consideration or inquiry as to whether such supplier could justify such a price on a cost basis or whether it was being offered to other customers of the supplier." 46 F. T. C., at 888. A typical instance of the maximum pressure found by the Commission was a series of negotiations in which representatives of petitioner sought to explain to a prospective supplier the kind of savings he might enjoy in sales to petitioner and might make the basis of a price differential. In such instances, petitioner sometimes gave the supplier estimates of what it considered "representative" percentage savings on various costs such as freight, sales costs, packaging, and returns and allowances.[4]

The Commission made no finding negativing the existence of cost savings or stating that whatever cost sav-

---

which respondents had induced or received discriminations in price, and certainly the records of not more than 5 of such sellers would have supplied ample evidence of such discriminations or price differentials." *In re Automatic Canteen Co. of America,* 46 F. T. C. 861, 892. Failure to limit the evidence in some such way to typical transactions would create an especially heavy burden in a proceeding against a buyer under § 2 (f) such as that here, where discriminatory sales were alleged to have been made by about 80 of the buyer's 115 suppliers.

[4] Although the Commission recited such instances, it did not relate them to what the buyer should have known as to costs. It did not find from such instances that the circumstances should have provoked inquiry in the mind of a prudent businessman. In short, we do not have a case in which the Commission in its informed judgment was led to conclude that in the circumstances knowing acceptance or inducement of a preference justified an inference of knowledge as to costs.

ings there were did not at least equal price differentials petitioner may have received. It did not make any findings as to petitioner's knowledge of actual cost savings of particular sellers and found only, as to knowledge, that petitioner knew what the list prices to other buyers were. Petitioner, for its part, filed offers of proof that many sellers would testify that they had never told petitioner that the price differential exceeded cost savings. An offer of proof was in turn made by the Commission as to the testimony of these sellers on cross-examination; such proof would have brought out that petitioner never inquired of its suppliers whether the price differential was in excess of cost savings, never asked for a written statement or affidavit that the price differentials did not exceed such savings, and never inquired whether the seller had made up "any exact cost figures" showing cost savings in serving petitioner.

Petitioner claims that the Commission has not, on this record, made a prima facie case of knowing inducement of prices that "made more 'than due allowance for'" cost differences, while the Commission contends that it has established a prima facie case, justifying entry of a cease and desist order where the buyer fails to introduce evidence. Before proceeding to an examination of the statutory provisions, it is desirable to consider the kind of evidence about which this dispute centers. Petitioner is saying in effect that, under the Commission's view, the burden of introducing evidence as to the seller's cost savings and the buyer's knowledge thereof is put on the buyer; this burden, petitioner insists, is so difficult to meet that it would be unreasonable to construe the language Congress has used as imposing it. If so construed, the statute, petitioner contends, would create a presumption so lacking rational connection with the fact established as to violate due process.

We have been invited to consider in this connection some of the intricacies inherent in the attempt to show costs in a Robinson-Patman Act proceeding. The elusiveness of cost data, which apparently cannot be obtained from ordinary business records, is reflected in proceedings against sellers.[5] Such proceedings make us aware of how difficult these problems are, but this record happily does not require us to examine cost problems in detail. It is sufficient to note that, whenever costs have been in issue, the Commission has not been content with accounting estimates; a study seems to be required, involving perhaps stop-watch studies of time spent by some personnel such as salesmen and truck drivers, numerical counts of invoices or bills and in some instances of the number of items or entries on such records, or other such quantitative measurement of the operation of a business.[6]

---

[5] For a collection of relevant authorities and secondary material available on cost showings under the Act, see Note, 65 Harv. L. Rev. 1011. See also Fuchs, The Requirement of Exactness in the Justification of Price and Service Differentials under the Robinson-Patman Act, 30 Tex. L. Rev. 1; Haslett, Price Discriminations and their Justifications under the Robinson-Patman Act of 1936, 46 Mich. L. Rev. 450, 472; Sawyer, Accounting and Statistical Proof in Price Discrimination Cases, 36 Iowa L. Rev. 244. For discussion of specific cost cases under the Act, see Aronson, Defenses under the Robinson-Patman Act, in Business and the Robinson-Patman Law (Werne ed.), 212, 227; Taggart, The Cost Principle in Minimum Price Regulation, 110, 8 Mich. Bus. Studies 151, 260 (1938); Warmack, Cost Accounting Problems Under the Robinson-Patman Act, CCH Robinson-Patman Act Symposium (1947) 105; Comment, 35 Ill. L. Rev. 60.

[6] Federal Trade Commission rulings in some cost cases "demonstrate that expert testimony and other evidence extrinsic to an actual cost analysis will be given little weight by the Commission. The FTC apparently believes that such materials lack the objectivity and relevance of the approved method of analysis." Note, 65 Harv. L. Rev. 1011, 1013–1014. See also Warmack, *supra*, note 5. Compare *In re Minneapolis-Honeywell Regulator Co.*, 44 F. T. C. 351, 394, a case

What kind of proof would be required of a buyer we do not know. The Commission argues that knowledge generally available to the buyer from published data or experience in the trade could be used by petitioner to make a reasonable showing of his sellers' costs. There was no suggestion in the Commission's opinion, however, that it would take a different attitude toward cost showings by a buyer than it has taken with respect to sellers, and "general knowledge of the trade," to use the Commission's phrase, unsupported by factual analysis has as yet been far from acceptable, and indeed has been strongly reproved by Commission accountants, as the basis for cost showings in other proceedings before the Commission.[7]

No doubt the burden placed on petitioner to show his sellers' costs, under present Commission standards, is heavy. Added to the considerable burden that a seller himself may have in demonstrating costs is the fact that the data not only are not in the buyer's hands but are ordinarily obtainable even by the seller only after detailed investigation of the business. A subpoena of the seller's records is not likely to be adequate. It is not a question of obtaining information in the seller's hands.[8] It is a matter of studying the seller's business afresh. Insistence on proof of costs by the buyer might thus have other implications; it would almost inevitably require a degree of cooperation between buyer and seller, as against other buyers, that may offend other antitrust policies, and it might also expose the seller's cost secrets to the prejudice of arm's-length bargaining in the future. Finally, not one but, as here, approximately 80 different sellers' costs may be in issue.

---

in which "an extensive cost study" resulting from "sincere and extensive efforts" was in part accepted.

[7] See, e. g., Warmack, supra, note 5, at 107, 110.

[8] Cf. Longman, Distribution Cost Analysis, 250, and articles cited supra, note 5.

It is against this background that the present dispute arises. The legislative setting indicates congressional recognition of the need to charge buyers with a responsibility for price discrimination comparable, so far as possible, to that placed on sellers. Thus, at the least, we can be confident in reading the words in § 2 (f), "a discrimination in price which is prohibited by this section," as a reference to the substantive prohibitions against discrimination by sellers defined elsewhere in the Act.[9] It is therefore apparent that the discriminatory price that buyers are forbidden by § 2 (f) to induce cannot include price differentials that are not forbidden to sellers in other sections of the Act, and, what is pertinent in this case, a buyer is not precluded from inducing a lower price based on cost differences that would provide the seller with a defense. This reading is, indeed, not seriously disputed by the parties. For we are not dealing simply with a "discrimination in price"; [10] the "dis-

---

[9] See, e. g., 80 Cong. Rec. 6428, 9419; H. R. Rep. No. 2951, 74th Cong., 2d Sess. 8.

[10] Were that the case, it might strictly be argued that the seller's "defenses" are not relevant in a § 2 (f) proceeding and that what is prohibited is the knowing inducement or receipt of a price lower than that accorded competing buyers. Such an interpretation has ambiguous legislative support. Congressman Utterback, in submitting the conference report to the House, stated, ". . . a discrimination is more than a mere difference. Underlying the meaning of the word is the idea that some relationship exists between the parties to the discrimination which entitles them to equal treatment, whereby the difference granted to one casts some burden or disadvantage upon the other." 80 Cong. Rec. 9416. Plainly enough, under this statement, a discrimination in price may mean either a price differential in sales to two competitors, or a price differential in sales to two competitors which, because of an absence of cost or other justification, puts the unfavored competitor at a disadvantage. Compare Haslett, supra, note 5, at 453–466, with McAllister, Price Control by Law in the United States, 4 Law & Contemp. Prob. 273, 291. In any event, controversy over the meaning of the isolated phrase "discrimination in price" is beside the point here.

crimination in price" in § 2 (f) must be one "which is prohibited by this section." Even if any price differential were to be comprehended within the term "discrimination in price," § 2 (f), which speaks of prohibited discriminations, cannot be read as declaring out of bounds price differentials within one or more of the "defenses" available to sellers, such as that the price differentials reflect cost differences, fluctuating market conditions, or bona fide attempts to meet competition, as those defenses are set out in the provisos of §§ 2 (a) and 2 (b).

This is not to say, however, that the converse follows, for § 2 (f) does not reach all cases of buyer receipt of a prohibited discrimination in prices. It limits itself to cases of knowing receipt of such prices. The Commission seems to argue, in part, that the substantive violation occurs if the buyer knows only that the prices are lower than those offered other buyers. Such a reading not only distorts the language but would leave the word "knowingly" almost entirely without significance in § 2 (f). A buyer with no knowledge whatsoever of facts indicating the possibility that price differences were not based on cost differences would be liable if in fact they were not. We have seen above that § 2 (f) does not refer to all price differentials. But we do not think that price differentials, even as a matter of uncritical impression, come so often within the prohibited range of price discriminations that the language can in any way be read one way for some purposes and another in relation to the word "knowingly."

The Commission's attempts in this case to limit the word "knowingly" to a more reasonable area of prohibition are not, we think, justified by the language Congress has used. The Commission argues that Congress was attempting to reach buyers who through their own activities obtain a special price and that "knowingly to induce or receive" can be read as charging such buyers

with responsibility for whatever unlawful prices result. But that argument would comprehend any buyer who engages in bargaining over price. If the Commission means buyers who exert undue pressure, the argument might find greater support in the legislative background but less in the language Congress has employed. Such a reading not only ignores the word "receive" but opens up even more entangling difficulties with interpretation of what is undue pressure.[11]

The Commission also urges, from legislative explanation of similar language in § 2 (a), that the word "receive" can in some way be limited to a continued and systematic receipt of lower prices that could fairly charge the recipient with knowledge of illegality.[12] While we need not decide whether systematic receipt of prices in itself

---

[11] Time and again there was recognition in Congress of a freedom. to adopt and pass on to buyers the benefits of more economical processes, see, *e. g.,* H. R. Rep. No. 2287, 74th Cong., 2d Sess. 10, 17; 80 Cong. Rec. 9415, 9417; buyer pressure to obtain the benefits of such savings could certainly not be undue pressure. Cf. Edwards, Maintaining Competition, 161. The Commission's findings do not suggest such a discrepancy in bargaining position between this buyer and his suppliers as to warrant characterizing the buyer as "bludgeoning." The Commission did find that those on whom the greatest "pressure" was exerted were such not inconsiderable candy manufacturers as the Curtiss Candy Co. and W. F. Schrafft & Sons Corp.

[12] See H. R. Rep. No. 2951, 74th Cong., 2d Sess. 5–6, explaining the language in § 2 (a) quoted *supra,* note 2, "or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination," as follows: The purpose of the addition of the word "knowingly" "is to exempt from the meaning of the surrounding clause those who incidentally receive discriminatory prices in the routine course of business without special solicitation, negotiation, or other arrangement for them on the part of the buyer or seller, and who are therefore not justly chargeable with knowledge that they are receiving the benefit of such discrimination." The context in which this explanation was given, as well as the precise language, so differs from § 2 (f) that this interpretation does not present a contradiction between it and our reading of § 2 (f).

could ever be sufficient to give the buyer the requisite knowledge,[13] we think, as the argument itself recognizes, that the inquiry must be into the buyer's knowledge of the illegality.

Not only are the arguments of the Commission unsatisfying, but we think a fairer reading of the language and of what limited legislative elucidation we have points toward a reading of § 2 (f) making it unlawful only to induce or receive prices known to be prohibited discriminations.[14] For § 2 (f) was explained in Congress as a provision under which a seller, by informing the buyer that a proposed discount was unlawful under the Act, could discourage undue pressure from the buyer.[15] Of course, such devices for private enforcement of the Act through fear of prosecution could equally well have been achieved by providing that the buyer would be liable if, through the seller or otherwise, he learned that the price he sought or received was lower than that accorded competitors, but we are unable, in the light of congressional policy as expressed in other antitrust legislation, to read this ambiguous language as putting the buyer at his peril whenever he engages in price bargaining. Such a reading must be rejected in view of

---

[13] See pp. 80–81, *post.*

[14] We of course do not, in so reading § 2 (f), purport to pass on the question whether a "discrimination in price" includes the prohibitions in such other sections of the Act as §§ 2 (d) and 2 (e).

[15] Congressman Utterback, in presenting the conference report to the House, spoke quite clearly in terms indicating that the provisions of § 2 (f) contemplated only the buyer who knew that the price was not justified by costs. Section 2 (f) "makes it easier [for the manufacturer] to resist the demand for sacrificial price cuts coming from mass-buyer customers, since it enables him to charge them with knowledge of the illegality of the discount, and equal liability for it, by informing them that it is in excess of any differential which his difference in cost would justify as compared with his other customers." 80 Cong. Rec. 9419.

the effect it might have on that sturdy bargaining between buyer and seller for which scope was presumably left in the areas of our economy not otherwise regulated.[16]   Although due consideration is to be accorded to administrative construction where alternative interpretation is fairly open, it is our duty to reconcile such interpretation, except where Congress has told us not to, with the broader antitrust policies that have been laid down by Congress. Even if the Commission has, by virtue of the Robinson-Patman Act, been given some authority to develop policies in conflict with those of the Sherman Act in order to meet the special problems created by price discrimination, we cannot say that the Commission here has adequately made manifest reasons for engendering such a conflict so as to enable us to accept its conclusion.   Cf. *Eastern-Central Motor Carriers Assn.* v. *United States,* 321 U. S. 194, 211–212.

We therefore conclude that a buyer is not liable under § 2 (f) if the lower prices he induces are either within one of the seller's defenses such as the cost justification or not known by him not to be within one of those defenses. This conclusion is of course only a necessary preliminary in this case.   As we have noted earlier, the precise issue in the case before us is the burden of introducing evidence—a separate issue, though of course related to the substantive prohibition.   This issue, involving as it does some of the same considerations, requires us further to consider a balance of convenience in the light of whatever evidentiary rules Congress has laid down for proceedings under the Act.   Assuming, as we have found, that there is no substantive violation if the buyer did not know that the prices it induced or received were not cost-justified, we must in this case determine whether proof that

---

[16] Cf. Adelman, Effective Competition and the Antitrust Laws, 61 Harv. L. Rev. 1289, 1331; Edwards, Maintaining Competition, 161.

the buyer knew that the price was lower is sufficient to shift the burden of introducing evidence to the buyer.

The Commission, in support of its position that it need only show the buyer's knowledge that the prices were lower, employs familiar interpretative tools without adequate regard to their immediate serviceability. It labels a seller's defense, such as the cost justification, as an "exception to the general prohibition" and from this argues that under conventional rules of evidence the Commission need come forward with evidence of violation only of the "general prohibition." This interpretation has foundation in the many commonsensical readings of comparable prohibitions so as to put the burden of showing a justification on the one who claims its benefits. We have said as much even in connection with that part of § 2 (b) of the Robinson-Patman Act which attempts to lay down the rules of evidence under the Act.[17] That section provides, "Upon proof being made . . . that there has been discrimination in price . . . the burden of rebut-

---

[17] *Federal Trade Commission* v. *Morton Salt Co.*, 334 U. S. 37, 44–45. Cf. S. Rep. No. 1502, 74th Cong., 2d Sess. 3. Section 2 (b) in its entirety reads as follows: "(b) Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor." Throughout this opinion, a reference to § 2 (b) is to the procedural language preceding the proviso; the language of the proviso, which we construed in *Standard Oil Co.* v. *Federal Trade Comm'n*, 340 U. S. 231, is referred to only when we speak of the "proviso of § 2 (b)."

ting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section." The Commission points out that it was under this section that we held in the *Morton Salt* case that the burden of showing a cost justification is on the seller in a § 2 (a) proceeding, and argues that the same burden is on the buyer. It argues that the "prima-facie case thus made" clearly refers back to "proof [of] discrimination in price" and thus, from our decision in *Morton Salt,* that the prima facie case of a prohibited discrimination to which § 2 (b) refers consists only of proof of a difference in prices in the sale of like goods having the requisite effect on competition. Saying that § 2 (f) differs from § 2 (a) "only in containing the express requirement that the buyer shall have 'knowingly' induced or received such price discriminations," the Commission asks us to hold that a prima facie case under § 2 (f) is made out with a showing of the prima facie case of § 2 (a) violation "plus the additional element of having induced or received such discrimination with knowledge of the facts which made it violative of Section 2 (a)."

We need not concern ourselves with the Commission's interpretation of the words "prima-facie case thus made" in § 2 (b) and the resulting conclusion that if § 2 (a) and § 2 (f) are to be read as counterparts, the elements necessary for a prima facie case under § 2 (a) are sufficient for a prima facie showing of the "discrimination in price which is prohibited by this section" in § 2 (f). However that may be, the Commission recognizes that there is an "additional element" resulting from the word "knowingly" in § 2 (f), and, of course, it is that element about which the controversy here centers and to which we must address ourselves. We may, however, note in passing that consistency between § 2 (a) and § 2 (f) both as to what constitutes the prohibited "discrimination in price" and as to the elements of a prima facie showing of the

prohibited "discrimination in price" would not be disturbed by a holding against the Commission in this case, for we are concerned here with the prima facie showing of knowledge, admittedly an independent and separate requirement of § 2 (f) above and beyond that of § 2 (a).

The Commission argues that a prima facie case of knowledge is made out when it is shown that the buyer knew the facts making the price differential violative of § 2 (a). At another point it urges that it must now show only "that the buyer affirmatively contributed to obtaining the discriminatory prices by special solicitation, negotiation or other action taken by him." However the argument is phrased, the Commission is, on this record, insisting that once knowledge of a price differential is shown,[18] the burden of introducing evidence shifts to the buyer. The Commission's main reliance in this argument is § 2 (b), which, as we have stated above, we interpreted in the *Morton Salt* case as putting the burden of coming forward with evidence of a cost justification on the seller, on the one, that is, who claimed the benefits of the justification.

To this it is answered that although § 2 (b) does speak not of the seller but of the "person charged with a violation of this section," other language in § 2 (b) and its proviso seems directed mainly to sellers,[19] that the legislative chronology of the various provisions ultimately resulting in the Robinson-Patman Act indicates that § 2 (b) was drafted with sellers in mind, and that the few cases so far decided have dealt only with sellers.

---

[18] In this connection, see *supra*, note 4, and *post*, note 24.

[19] For example, the language of the proviso of § 2 (b) concerning price differentials made to meet competition refers only to "a seller"; further, the authority given the Commission under § 2 (b) when justification is not shown is "to issue an order terminating the discrimination," an order that could not usefully be directed to buyers. But cf. 80 Cong. Rec. 9418.

A confident answer cannot be given; some answer must be given. We think we must read the infelicitous language of § 2 (b) as enacting what we take to be its purpose, that of making it clear that ordinary rules of evidence were to apply in Robinson-Patman Act proceedings.[20] If § 2 (b) is to apply to § 2 (f), although we do not decide that it does because we reach the same result without it, we think it must so be read. Considerations of fairness and convenience operative in other proceedings must, we think, have been controlling in the drafting of § 2 (b), for it would require far clearer language than we have here to reach a contrary result. Cf. *Addison* v. *Holly Hill Co.*, 322 U. S. 607, 617–618. If that is so, however, decisions striking the balance of convenience for Commission proceedings against sellers are beside the point.[21] And we think the fact that the buyer does not have the required information, and for good reason should not be required to obtain it, has controlling importance in striking the balance in this case. This result most nearly accommodates this case to the reasons that have been given by judges and

---

[20] Congressman Patman, describing the § 2 (b) rule as to the burden of proof, said: "It means exactly the rule of law today. It is a restatement of existing law. So far as I am concerned you can strike it out. It makes no difference. It is the law of this land exactly as it is written there." 80 Cong. Rec. 8231.

[21] It does not aid understanding to suggest that § 2 (f) has the same significance, as to a knowing buyer, as other sections of the Act have as to a knowing seller. A buyer knowing he is receiving a lower price cannot be said to be in the same position as a seller granting a lower price. The language of the statute bars such a construction. Even if the buyer has the "same" burden as the seller, the fact that a seller has the burden to show his costs does not automatically, by virtue of § 2 (f), become a buyer's burden to show the seller's cost. Nor has *Federal Trade Commission* v. *Staley Mfg. Co.*, 324 U. S. 746, 759–760, any helpful relation to the problem of this case, if for no other reason than that that case did not call for a detailed consideration of the procedural portions of § 2 (b).

legislators for the rule of § 2 (b), that is, that the burden of justifying a price differential ought to be on the one who "has at his peculiar command the cost and other record data by which to justify such discriminations." [22] Where, as here, such considerations are inapplicable, we think we must disregard whatever contrary indications may be drawn from a merely literal reading of the language Congress has used. It would not give fair effect to § 2 (b) to say that the burden of coming forward with evidence as to costs [23] and the buyer's knowledge thereof shifts to the buyer as soon as it is shown that the buyer knew the prices differed. Certainly the Commission with its broad power of investigation and subpoena, prior to the filing of a complaint, is on a better footing to obtain this information than the buyer. Indeed, though it is of course not for us to enter the domain of the Commission's discretion in such matters, the Commission may in many instances find it not inconvenient to join the offending seller in the proceedings.

If the requirement of knowledge in § 2 (f) has any significant function, it is to indicate that the buyer whom Congress in the main sought to reach was the one who, knowing full well that there was little likelihood of a defense for the seller, nevertheless proceeded to exert pressure for lower prices. Enforcement of the provisions of § 2 (f) against such a buyer should not be difficult. Proof of a cost justification being what it is, too often no one can ascertain whether a price is cost-justified. But trade ex-

---

[22] 80 Cong. Rec. 3599. *Samuel H. Moss, Inc.* v. *Federal Trade Commission,* 148 F. 2d 378, 379; 80 Cong. Rec. 8241.

[23] Our view that § 2 (b) permits consideration of conventional rules of fairness and convenience of course requires application of those rules to the particular evidence in question. Evidence, for example, that the seller's price was made to meet a competing seller's offer to a buyer charged under § 2 (f) might be available to a buyer more readily even than to a seller.

perience in a particular situation can afford a sufficient degree of knowledge to provide a basis for prosecution. By way of example, a buyer who knows that he buys in the same quantities as his competitor and is served by the seller in the same manner or with the same amount of exertion as the other buyer can fairly be charged with notice that a substantial price differential cannot be justified. The Commission need only show, to establish its prima facie case, that the buyer knew that the methods by which he was served and quantities in which he purchased were the same as in the case of his competitor. If the methods or quantities differ, the Commission must only show that such differences could not give rise to sufficient savings in the cost of manufacture, sale or delivery to justify the price differential, and that the buyer, knowing these were the only differences, should have known that they could not give rise to sufficient cost savings. The showing of knowledge, of course, will depend to some extent on the size of the discrepancy between cost differential and price differential, so that the two questions are not isolated. A showing that the cost differences are very small compared with the price differential and could not reasonably have been thought to justify the price difference should be sufficient.

What other circumstances can be shown to indicate knowledge on the buyer's part that the prices cannot be justified we need not now attempt to illustrate; [24] but

---

[24] We need not in this case consider the weight that can be attached to affirmative statements by the seller to the buyer that a price was or was not cost-justified, since there were no such statements in this case. See *supra,* p. 67. We need not now consider whether in an appropriate case the Commission may find it necessary to subject such statements to careful scrutiny. Thus, for instance, the Commission may consider that a seller stating that a price would be unlawful might in some situations be puffing rather than stating anything which a buyer can rely on or should be charged with. On the other hand, the Commission may in some circumstances

surely it will not be an undue administrative burden to explain why other proof may be sufficient to justify shifting the burden of introducing evidence that the buyer is or is not an unsuspecting recipient of prohibited discriminations. We think, in any event, it is for the Commission to spell out the need for imposition of such a harsh burden of introducing evidence as it appears to have sought in this case. Certainly we should have a more solid basis than an unexplained conclusion before we sanction a rule of evidence that contradicts antitrust policy and the ordinary requirements of fairness. While this Court ought scrupulously to abstain from requiring of the Commission particularization in its findings so exacting as to make this Court in effect a court of review on the facts, it is no less important, since we are charged with the duty of reviewing the correctness of the standards which the Commission applies and the essential fairness of the mode by which it reaches its conclusions, that the Commission do not shelter behind uncritical generalities or such looseness of expression as to make it essentially impossible for us to determine what really lay behind the conclusions which we are to review. Cf. *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499, 510–511.

Because of our view of the balance of convenience in these circumstances, we do not reach petitioner's claim that the Commission is in effect saying that knowledge of a difference in prices creates a presumption of knowledge that the price was unlawful, a presumption it claims would fall for lack of rational connection under *Tot* v. *United States,* 319 U. S. 463. Cf. Note, E[dmund]

wish to refuse to accept a buyer's claim that he relied on an affidavit or other assurance from the seller that price differentials were cost-justified; the furnishing of such an assurance might, together with other circumstances, indicate a sufficient absence of arm's-length bargaining to raise serious doubts as to the weight the assurance should be given in support of a buyer's claim.

M. M[organ], 56 Harv. L. Rev. 1324. It has seemed to us unnecessary in this case to speak of presumptions, and we need only call attention to the fact that in this case, as in the *Tot* case, we have dealt only with the burden of introducing evidence and not with the burden of persuasion, as to which different considerations may apply.

The judgment of the Court of Appeals, accordingly, is reversed as to the charges in Count II of the complaint (Count I is not before us), and the case is remanded to that court with instructions to remand it to the Federal Trade Commission for such further action as is open under this opinion.

*It is so ordered.*

Mr. Justice Douglas, with whom Mr. Justice Black and Mr. Justice Reed concur, dissenting.

This decision is a graphic illustration of the way in which a statute can be read with enervating effect.

Section 2 (b) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13 (b), provides that where proof is made that there has been "discrimination in price or services or facilities furnished, the burden of rebutting the prima facie case thus made by showing justification shall be *upon the person charged with a violation of this section,* and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination . . . ." (Italics added.)

Section 2 (f) makes it unlawful *"for any person"* engaged in commerce "knowingly to induce or receive a discrimination in price which is prohibited by this section." (Italics added.)

The words "the person charged" as used in § 2 (b) and the words "any person" used in § 2 (f) plainly include buyers as well as sellers.

The nature of the discrimination condemned is made clear in § 2 (a). It outlaws discrimination "in price between different purchasers of commodities of like grade and quality" where the effect is substantially to prevent or lessen competition or tend to create a monopoly as respects any person "who either grants or knowingly receives the benefit of such discrimination." But it permits price differentials "which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities" in which the commodities are sold or delivered.

In the present case, the Court determines that even though a "buyer knew that the price was lower," such knowledge is insufficient to "shift the burden of introducing evidence to the buyer." But § 2 (b) requires the person shown to have practiced a discrimination to establish a justification. Section 2 (f) was intended to make clear that the same bans and burdens are on a *knowing* buyer obtaining discriminatory prices as we held in *Federal Trade Commission* v. *Staley Mfg. Co.*, 324 U. S. 746, 759–760, approved in *Standard Oil Co.* v. *Federal Trade Commission*, 340 U. S. 231, are on a *knowing* seller who grants them.

The record shows persistent and continuous efforts of this large buyer in wheedling and coercing suppliers into granting it discriminatory prices. The Commission summarized petitioner's activities in far more sedate terms than their bizarre nature justified:

> "Respondent used various methods to induce its suppliers to grant discriminatory prices. One of these was to inform prospective suppliers of the prices and terms of sale which would be acceptable to the respondent without consideration or inquiry as to whether such supplier could justify such a price on a cost basis or whether it was being offered to other

customers of the supplier. At other times the respondent refused to buy unless the price to it was reduced below prices at which the particular supplier sold the same merchandise to others. In other instances respondent sought to explain to the prospective supplier that certain alleged savings would accrue to the supplier in selling to respondent or that certain elements of the supplier's cost could be eliminated, which would, in respondent's opinion, justify a lower price. In carrying out this form of inducement, respondent would advise a supplier or prospective supplier of the price which it considered 'standard price'. In letters written to the Curtiss Candy Company on November 15, 1939, and to W. F. Schrafft & Sons Corporation on February 15, 1937, respondent summarized alleged savings to these companies as follows:

| "           Alleged Savings | Curtiss Co. | Schrafft Corp. |
|---|---|---|
| (1) Freight savings of.................. | 6% | 5% to 7% |
| (2) Sales cost savings of.............. | 7% | 7% |
| (3) 24-count cartons savings of........ | 5% | 5% |
| (4) Return and allowances savings of... | 1% | 1% to 2% |
| (5) Free deals and samples savings of... | 8% | 2% to X% |
| (6) Shipping containers savings of...... | .... | 1% to 2% |
| Total deductions.............. | 27% | 21% to 25% |

"Respondent advised these companies that such alleged savings could be made because of the method by which respondent made purchases and because certain services could be eliminated in selling to it."

There is no doubt that the large buyers wield clubs that give them powerful advantages over the small merchants. Often large merchants gain advantages over other sellers of the same merchandise by obtaining price concessions by pressure on their suppliers. The evil was

acknowledged in *Federal Trade Commission* v. *Morton Salt Co.,* 334 U. S. 37, 43. The Congress plainly endeavored to curb the buyer in the kind of activities disclosed by this record. As the House Report reveals, the line sought to be drawn was between those who incidentally receive discriminatory prices and those who actively solicit and negotiate them. H. R. Rep. No. 2951, 74th Cong., 2d Sess., pp. 5–6.

The Court disregards this history. The Court's construction not only requires the Commission to show that the price discriminations were not justified; it also makes the Commission prove what lay in the buyer's mind. I would let the acts of the buyer speak for themselves. Where, as here, the buyer undertakes to bludgeon sellers into prices that give him a competitive advantage, there is no unfairness in making him show that the privileges he demanded had cost justifications. This buyer over and again held itself out as a cost expert.* I would hold it to its professions. Since it was the coercive influence, there is no unfairness in making it go forward with evidence to rebut the Commission's prima facie case.

---

*A reading of the record leaves no doubt that petitioner knew in numerous instances that it was squeezing a price from the seller which was less than the seller's costs.