346 F.2d 311
 GENERAL AUTO SUPPLIES, INC., Petitioner,
v.
FEDERAL TRADE COMMISSION, Respondent.
BARNES MOTOR & PARTS CO. et al., Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
APPALACHIAN AUTO PARTS CO., Inc., et al., Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
NATIONAL PARTS WAREHOUSE et al., Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
 Nos. 14534, 14569, 14580, 14606.
 United States Court of Appeals Seventh Circuit.
 May 28, 1965, Rehearing Denied July 6, 1965.
 
 Bernard Mellitz, Malcolm I. Frank, and Thomas P. Weil, St. Louis, Mo., for petitioners Barnes Motor & Parts Co. et al., Appalachian Auto Parts Co., Inc., et al., National Parts Warehouse, et al.
 Teleford B. Orbison, New Albany, Ind., for petitioner General Auto Supplies, Inc.
 J. B. Truly, Asst. Gen. Counsel, Thomas F. Howder, Attorney, Federal Trade Commission, Washington, D.C., James McI. Henderson, General Counsel, Richard Campbell Foster, Attorney, for the Federal Trade Commission, for respondent.
 Before DUFFY, SCHNACKENBERG and SWYGERT, Circuit Judges.
 SCHNACKENBERG, Circuit Judge.
 
 
 1
 These cases are before us on petitions[1] to review an order of the Federal Trade Commission, respondent here, which was issued following proceedings upon a complaint charging petitioners with violating 2(f) of the Clayton Act as amended by the Robinson-Patman Act, by knowingly inducing or receiving discriminations in price prohibited under 2(a) thereof. 15 U.S.C.A. 13(a) and (f).
 
 
 2
 The complaint charged National Parts Warehouse, petitioner here, a limited partnership organized under the laws of Georgia, with being in reality a 'buying group', although utilizing partnership form, and that it was a membership organization organized, maintained, managed, controlled and operated by and for more than fifty members, consisting of corporations, partnerships and individuals engaged in the business of 'jobbing' automotive parts and supplies. National was charged with serving as a 'medium or instrumentality' whereby these jobbers 'exert the influence of their combined bargaining power' upon manufacturer-suppliers because of their 'aggregate purchasing power as a buying group'. In this manner, the complaint alleged, the jobbers 'knowingly demanded and received, upon their individual purchases, discriminatory prices, discounts, allowances, rebates, and terms and conditions of sale'.
 
 
 3
 The complaint recognized that purchases from suppliers were billed to and paid by National but alleged that in reality it merely served as agent for its jobber-members in order to facilitate the inducement and receipt of price discriminations. The complaint further alleged that petitioner-jobbers were in active competition with independent jobbers who were not affiliated with National and that there were price discriminations on goods of like quality and grade between these competitors and the effect of the knowing inducement or receipt of the price discriminations has been, and may be, substantially to lessen, injure, destroy or prevent competition between the National jobbers and the competing independent jobbers not receiving such discriminations.
 
 
 4
 Petitioner Bryant M. Smith, Sr. was alleged to be National's manager and general partner.
 
 
 5
 An answer was filed by National and Smith, and another by the other respondents (the jobbers as limited partners). Following hearings before examiner Creel, an initial decision in favor of the Commission was entered with a cease and desist order against all respondents. On review, the Commission modified and then adopted the initial decision and issued a final order against all respondents to cease and desist from
 
 
 6
 (1) Knowingly inducing, or knowingly receiving or accepting, any discrimination in the price of such products by directly or indirectly inducing, receiving or accepting from any seller a net price respondents know or should know is below the net price at which said products of like grade and quality are being sold by such seller to other customers who in fact compete with respondents in the resale and distribution of such products.
 
 
 7
 (2) Maintaining, operating, or utilizing respondent National Parts Warehouse or any other organization as a means or instrumentality to induce or receive discounts or rebates which result in a net price respondents know or should know is below the net price at which said products of like grade and quality are being sold by such seller to other customers who in fact compete with respondents in the resale and distribution of such products. The provisions of this paragraph (2) are not applicable to respondent National Parts Warehouse or respondent Bryant M. Smith, Sr.[2]
 
 
 8
 This order we now review.
 
 
 9
 National was organized in 1956 by jobbers and began operations by acquiring all the assets and liabilities and taking over the operations of two companies which had been owned and operated by the jobbers. Capital was contributed by limited partners and a warehouse was built which was leased to National. As stated in petitioners' brief, the purpose of National was to engage in the business of a warehouse distributor of automotive parts with its net earnings to be distributed to the limited partners at the end of each year in proportion to the amount of their purchases from the partnership. All of the limited partners are auto parts jobbers and have invested amounts varying from $10,000 to $25,000[3] in National. Except as hereinafter indicated, the management and control of every phase of its business, including what lines to buy, is vested in Smith, the general partner. According to petitioners, every one of the partners who testified stated that the final decisions on what lines to buy and stock were in the sole control of Smith and that, if they offered advice to him on these matters, he frequently did not follow it.
 
 
 10
 About 1953, according to Smith's testimony, he was an automotive jobber and then formed Automotive Parts Distributors, Incorporated (APDI), as jobbers were getting together in those days and buying jointly so as to qualify for volume rebates which was the custom of most suppliers in the industry. He then heard about the Robinson-Patman Act and that was the reason that he 'got out of APDI' because a Mr. Cassidy 'with the Federal Trade Commission' advised him to go into a limited partnership program because 'it is legal' for 'we would be able to carry on a warehousing program.' Having been told that the Commission had criticized the direction and control of the group operation by jobbers, 'we changed from what we had because actually under the old Co-op deal we did have a Board of Directors and they dictated what was going on and so forth; but, under this program the jobbers wouldn't have anything to do with it, and at the same time it would be a legal organization, * * * merchandising, selling operation, rather than a bookkeeping device.'
 
 
 11
 Smith testified that he notified the limited partners that as a general partner National was his operation and that they had no right to direct its control. From its inception National sold to jobbers generally, partners and non-partners alike, at the same price, but no sales at any time at the dealer level. Among exhibits in evidence is National's letter signed by Smith on November 29, 1957, reminding the partners to use
 
 
 12
 'the NPW (National) form. It will cost you money to purchase on your own form when they have given to your warehouse the following discount:
 
 
 13
 Non-stocking jobber 20%
 
 
 14
 Stocking jobber 30%
 
 
 15
 In other words, you get the full jobber price of 30% Less another 10% That the warehouse makes. Please check with your buyer on this as I understand that some of the Partners have been ordering on their own form and losing this discount.'
 
 
 16
 The Commission found that National performs many of the functions that a warehouse distributor normally performs, purchasing for its own account, warehousing merchandise, billing its jobber customers at the manufacturer's suggested jobber prices, and settling its account with suppliers on a monthly basis, receiving discounts and allowances from the suppliers in accordance with its arrangements with them. The Commission did not disturb the hearing examiner's finding that the 'one paramount function of a warehouse distributor is to sell, and this NPW (National) does not do' except to non-partner jobbers.[4]
 
 
 17
 On purchases from manufacturers, the Commission found that National normally obtained a 'warehouse distributor' discount, which, in most instances, amounted to approximately 20% Of the price at which jobbers purchased. In this connection, the Commission found that the 'very existence' of National was 'predicated upon its ability to buy at a lower price than that at which the jobber-partners, acting in their respective individual capacities, could themselves purchase.' The jobbers were billed monthly by National at the manufacturers' suggested jobber prices. The warehouse distributor discounts received by National less its operating expenses were distributed annually as rebates in proportion to the amount of each partner's purchases, in accordance with the partnership agreement.
 
 
 18
 The Commission found that the dollar amount of National purchases and the discounts and allowances received from suppliers and passed on to the jobberpartners were substantial. For the years 1956 through 1960, they were as follows:
 
 Discounts and
 Allowances Less
 National Expenses, Passed
 Year Purchases On To Partners
 
 19
 ---- ---------- ----------------
 
 1956 $2,950,978 $259,749
 1957 3,723,720 355,013
 1958 4,664,921 444,052
 1959 5,606,555 575,613
 1960 5,588,862 534,073
 
 20
 For these years, the average net rebate turned over to the jobbers was:
 
 Average
 Net
 Year Rebate
 
 21
 ---- -------
 
 
 22
 1956 8.92%
 
 
 23
 1957 9.70%
 
 
 24
 1958 9.78%
 
 
 25
 1959 10.73%
 
 
 26
 1960 10.11%These rebates were found by the examiner in substance to constitute discriminatory price reductions in favor of the petitioner-jobbers on their purchases of automotive products through National.
 
 
 27
 Petitioners in their brief assert that it is Smith, and not the limited partners, who manages and controls the operations of National and that, while he seeks advice and counsel as to product preferences of his jobber customers who include limited partners, it is clear that he alone runs the business and makes the final decisions. The Commission, relying upon what it calls the 'indirect purchaser' doctrine regards this issue as lacking particular significance.[5]
 
 
 28
 1. We are convinced that the absoluteness of Smith's control is formal but unreal and was meant to be that way. His is a position in an operation set up by a group of jobbers for the real purpose of obtaining from suppliers discriminatory discounts and that purpose has been thereby attained.
 
 
 29
 Petitioners seek to sustain their position by emphasizing that National was not only buying and selling automotive parts but was operating a warehouse. In fact, partly because of the latter operation, they seek to distinguish American Motor Specialties Co. v. F.T.C., 2 Cir., 278 F.2d 225 (1960), cert. den. 364 U.S. 884, 81 S.Ct. 169, 5 L.Ed.2d 105, relied upon by the Commission here. In American Motor Specialties, it appeared that 17 jobbing firms organized two successive buying groups to achieve the price advantages of larger scale buyers. The court, at 228, said:
 
 
 30
 'Petitioners of course knew that they, as individual firms, were receiving goods in the same quantities and were served by sellers in the same manner as their competitors, and hence organized themselves into a buying group in order to obtain lower prices than their unorganized competitors. Hence, by the very fact of having combined into a group and having obtained thereby a favorable price differential, they each, under Automatic Canteen, were charged with notice that this price differential they each enjoyed could not be justified. And this knowledge of each of the seventeen individual firms is imputable to the organization of which they were all members. Thus, irrespective of whether the buying groups' efforts to bargain with the various manufacturers constituted an improper inducement under Section 2(f), we hold that the Commission introduced sufficient evidence to fulfill the requirements of Automatic Canteen when it showed that petitioners knowingly received preferential price treatment of such a nature as to violate Section 2.'
 
 
 31
 The essential purpose of a warehouse distributor is to sell the product sold to it by suppliers and the primary purpose of its functional compensation is for this service. But National did not sell, except for 6% Of its 1961 business which consisted of commission sales to nonpartner jobbers. That National's function was not to sell is emphasized by the fact that it made no effort to do so and that the sales efforts were actually made by the suppliers themselves or their sales representatives.[6]
 
 
 32
 2. After reviewing the record we conclude that it contains substantial evidence to support the Commissions's findings that the price discriminations induced or received by the petitioner-jobbers would likely result in adverse competitive effects upon competing independent jobbers. It was not necessary that the record show any specific Commission, 7 Cir., 239 F.2d 152, 154 competing nonaffiliated jobbers, as now urged by petitioners. It is sufficient that the price discriminations may have the prescribed effect, as we stated in E. Edelmann & Company v. Federal Trade (1956), cert. den. 355 U.S. 941, 78 S.Ct. 426, 2 L.Ed.2d 422 (1958). It is our judgment that the Commission rightly concluded that the petitioner-jobbers well knew that the price discriminations which they received could not fail to injure their competitors.
 
 
 33
 3. Petitioners rely on that part of 15 U.S.C.A. 13(a), known as 2(a) of the Clayton Act as amended by the Robinson-Patman Act, which provides that nothing in the Act 'shall prevent differentials which make only due alllowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered.' They contend that the prices paid by National to its suppliers were cost-justified, as the suppliers' costs in dealing with National were considerably less than the cost of dealing with many individual jobbers. They add that the burden is on the Commission to make a necessary cost study.
 
 
 34
 In Automatic Canteen Co. of America v. Federal Trade Commission, 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953), the court considered 2(f), which reads:
 
 
 35
 '(f) It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section.'
 
 
 36
 It then discussed the question as to who has the burden of proof under 2(f). It said, at 79, 73 S.Ct. at 1027:
 
 
 37
 'If the requirement of knowledge in 2(f) has any significant function, it is to indicate that the buyer whom Congress in the main sought to reach was to one who, knowing full well that there was little likelihood of a defense for the seller, nevertheless proceeded to exert pressure for lower prices. Enforcement of the provisions of 2(f) against such a buyer should not be difficult. Proof of a cost justification being what it is, too often no one can ascertain whether a price is cost-justified. But trade experience in a particular situation can afford a sufficient degree of knowledge to provide a basis for prosecution. By way of example a buyer who knows that he buys in the same quantities as his competitor and is served by the seller in the same manner or with the same amount of exertion as the other buyer can fairly be charged with notice that a substantial price differential cannot be justified. The Commission need only to show, to establish its prima facie case, that the buyer knew that the methods by which he was served and quantities in which he purchased were the same as in the case of his competitor. If the methods or quantities differ, the Commission must only show that such differences could not give rise to sufficient savings in the cost of manufacture, sale or delivery to justify the price differential, and that the buyer, knowing these were the only differences, should have known that they could not give rise to sufficient cost savings. * * *'
 
 
 38
 We interpret this language to mean that, in view of the circumstances assumed in the quotation, the burden of proof in this case is on the buyer.
 
 
 39
 We hold, from our examination of the record, that the Commission was justified by substantial evidence in the record in its finding that National's 'warehouse distributor' discount was not cost-justified. The cost factors involved in that determination were those relating to alleged savings on freight charges, billing expenses and the expense of selling.
 
 
 40
 In accordance with the Commission's decision, the effect of which we weigh under the rule announced in Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456, we hold that National's favorable discounts to its limited partners were not 'cost-justified' and that they knew, or at least should have known, that they were not.
 
 
 41
 4. Petitioners seek to rely on our recent holding in Central Retailer-Owned Grocers, Inc. v. Federal Trade Commission, 319 F.2d 410 (7 Cir. 1963), as to which no petition for certiorari was filed in the United States Supreme Court. However, in Central, the Commission in its complaint took the position that the sums Central received and accepted from certain of its suppliers constituted brokerage or allowances in lieu of brokerage, in violation of 2(c) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C.A. 13(c). It was upon that theory alone that the case was submitted to and decided by us. No such theory has been asserted in the case at bar; instead it is here insisted that National was used by the jobbers as an instrumentality by which they used their aggregate purchasing power as a buying group to receive discriminatory prices and allowances, in violation of 2(a) and (f) of said act. No such contention was made in Central and our holding there is inapposite here.
 
 
 42
 For these reasons, the order of the Commission is affirmed and will be enforced.
 
 
 43
 Order affirmed.
 
 
 44
 SWYGERT, Circuit Judge (concurring).
 
 
 45
 I concur in Judge Schnackenberg's opinion. There are, I think, some additional considerations that warrant an affirmance of the Commission's order. As Commissioner Higginbotham points out in his separate concurring opinion, nearly $1,000,000 worth of National Parts' $5,000,000 annual business represents 'drop shipments' from the manufacturers direct to the jobber members of National Parts. Even though a five per cent 'penalty' is deducted from the warehousing discount allowed National Parts on these drop shipments, I am in agreement with the Commissioner's view that 'as to these drop shipment sales, the respondent (NPW) does not perform any bona fide warehousing function, and it cannot properly be concluded that the respondent is 'selling distribution' to the manufacturers from which it has induced a discount or payment.' Moreover, many of the suppliers dealing with National Parts maintain their own separate warehouses in Atlanta, thus duplicating the warehousing function performed by National Parts. The record also shows that five per cent is the normal fee charged by independent commercial warehousemen for storing goods of automotive parts manufacturers; yet National Parts receives a twenty per cent discount. Even if it were to be argued that the fifteen per cent differential represents in large part a selling expense, the record shows that National Parts is burdened with little, if any, expense in selling automotive parts to its jobber members.
 
 
 46
 These factors, when considered with those outlined by Judge Schnackenberg, conclusively indicate that the approximate ten per cent rebate given by National Parts to its jobber members represents a discrimination in price proscribed by section 2(a) and 2(f) of the Robinson-Patman Act.
 
 
 
 [1]
 For convenience we now describe the parties herein in converse numerical order as to the cases
 In No. 14606, petitioners are National Parts Warehouse, a limited partnership (hereinafter referred to as National), organized under the laws of Georgia, and Bryant M. Smith, Sr., a general partner, and 35 limited partners thereof; in No. 14580, petitioners are Appalachian Auto Parts Co., Inc., a corporation, a limited partner, and 9 other limited partners in National; in No. 14569, petitioners are Barnes Motor & Parts Co., and 8 other limited partners in National; in No. 14534, petitioner is General Auto Supplies, Inc., an Indiana corporation, a limited partner in National.
 
 
 [2]
 The order provides:
 For the purpose of determining the 'net price' under the terms of this order, there shall be taken into account all discounts, rebates, allowances, deductions or other terms and conditions of sale by which net prices are effected.
 
 
 [3]
 The original capital contribution made by each limited partner was $6500
 
 
 [4]
 Both the examiner and the Commission found that National's only merchandising efforts were those made on sales to independent jobbers, and that these amounted to but 6% Of its total 1961 dollar volume
 
 
 [5]
 It is important to note that the Commission gave particular consideration to the facts urged upon it by respondents before it in an effort to show that Smith, the general partner, exercised a sole discretion. In this connection, the Commission made the following statement:
 'One of the more significant of the partnership's 'decisions' was the making, from time to time, of the choice between 'lines' of auto parts, that is, between the offerings of competing manufacturers. Respondents contend that this was committed solely to the discretion of Smith, the general partner, and that, at most, he merely secured the 'advice' of the jobber partners. The facts are otherwise. The partnership agreement itself provided for an 'Advisory Committee' to aid the general partner in 'making decisions.' Subsequently, a 'Lines Committee' was formed to aid him in selecting the supplier lines to be handled by the partnership. Under the formal partnership agreement, members of the Advisory Committee were to be 'appointed' by Smith. But in his writings to his partners, he reminds them of the names of the persons they have 'elected' to membership in that Committee. And he reported to them that they had 'voted to purchase the Felt Products Company line of Gaskets,' and that they had 'approved for six month's trial the line of Wesco Universal Joints and Kits.' Indeed, it appears that Smith 'decides' on lines to be handled by sending out post cards on which each partner indicates his vote: 'Dear Partners: According to the letter that was sent out and the cards returned, it is certainly evident that you want to remain' with 'Herbrand Tools-- and ViChrome Tools. In connection with the Herbrand Tools, we had only eight votes that were outstanding against the Herbrand Tool line and wanted the other line.'
 'Finally, of course, there is the fact, noted by the examiner, that the jobber-partners, at all times possessed the ultimate power over NPW (National)-- they could withdraw, pull out their money, and hence kill it. Thus Smith, the 'general' partner, wrote to his 'limited' partners as follows: 'Bear in mind that you voted in your meeting Saturday that you would continue your investment in National Parts Warehouse."
 
 
 [6]
 The correctness of our holding is emphasized by the fact that drop (direct) shipments from suppliers to jobber-partners amounted to approximately 20% Of National's sales in 1961. Obviously, as to these shipments, which were substantial, National did not perform any warehousing function whatsoever