**KAPIOLANI MOTORS, LTD., Plaintiff,**

v.

**GENERAL MOTORS CORPORATION**
and General Motors Overseas Distributors Corporation, Defendants and Third-Party Plaintiffs.

**MIKE SALTA PONTIAC, INC.,**
Defendant,

v.

**James ZUKERKORN, Third-Party
Defendant.**

**Civ. No. 2943.**

United States District Court,
D. Hawaii.

Feb. 2, 1972.

See also, D.C., 300 F.Supp. 784.

Vernon F. L. Char, Honolulu, Hawaii (Damon, Shigekane & Char, Honolulu, Hawaii, of counsel), Maxwell M. Blecher, Los Angeles, Cal. (Blecher & Collins, Los Angeles, Cal., of counsel), for plaintiff Kapiolani Motors and third-party defendant James Zukerkorn.

Martin Anderson, James M. Sattler, Honolulu, Hawaii (Jenks, Kidwell, Goodsill & Anderson, Honolulu, Hawaii,

of counsel), Julius Russu, Detroit, Mich. (Ross L. Malone, Detroit, Mich., of counsel), for defendants and third-party plaintiffs General Motors Corp. and General Motors Overseas Distributors Corp.

John D. McComish, Honolulu, Hawaii (Fong, Miho, Robinson, Zimmerman & McComish, Honolulu, Hawaii, of counsel), Stephen A. Nye, Peter V. Brucher, San Francisco, Cal. (Sullivan, Jones, Archer & Brucher, San Francisco, Cal., of counsel), for defendant Mike Salta Pontiac, Inc.

## DECISION ON MOTION FOR SUMMARY JUDGMENT

PENCE, Chief Judge.

Mike Salta Pontiac, Inc., in its counterclaim against Kapiolani Motors, argues that Kapiolani, by its monetary return from General Motors on allegedly fraudulent and false warranty claims against General Motors, has unlawfully induced and received a price discrimination in violation of § 2(f) of the Clayton Act, 15 U.S.C. § 13(f). Salta's contention is that the payment by General Motors of Kapiolani's fraudulent claims, made General Motor's net receipts for the goods (Pontiacs) sold to Kapiolani less than the net receipts from Salta for similar goods, and that there thus resulted a regular and systematic reduction each in the net amount paid by Kapiolani, the buyer, to General Motors, the seller, for its cars. Kapiolani has moved for a summary judgment as to such claim.

The only case that lends any possible support to Salta's contention is Kroger Co. v. F.T.C., 438 F.2d 1372 (6 Cir. 1971). There, Kroger falsely represented to Borden, a supplier, that its bids for milk were much higher than another bid received by Kroger, and demanded that Borden come down in price to meet it. In an effort to meet the purported competition, Borden submitted a lower bid which was accepted by Kroger.

Borden's final bid was far below any of those submitted by any of the competitors, and far below the prices Borden quoted to any other purchaser. The court found that the price as quoted to defendant was discriminatory, but found the supplier, Borden, not liable under § 2(a) as its conduct was privileged in trying to meet what it had been led to believe were its competitors' bids. The court, however, held the defendant Kroger liable under § 2(f) for inducing and receiving a price discrimination.

Salta claims that *Kroger* supports its theory inasmuch as Kapiolani also allegedly used fraud to procure what Salta characterizes as a lower "net price" for Pontiacs from General Motors.

An examination of the legislative history behind the Robinson-Patman Act shows clearly that the conduct charged here is not the type Congress sought to proscribe by § 2(f), the "buyer provision". The Act came about at a time when large chain buyers were exerting their buying power to obtain preferential prices in the purchase of goods. As a result, smaller buyers, unable to exert such power, were put at a competitive disadvantage. The Robinson-Patman Act was aimed at those large buyers. "The Act sought to suppress discrimination between customers of the same seller not supported by sound economic differences in their business position * * * " [1]

Nowhere in the legislative history of the Act does it indicate that Congress was worried about purchasers who would engage in fraud, misrepresentation, or actual stealing from suppliers to procure economic advantages only secondarily relevant to "net price". Although *Kroger* did involve fraudulent misrepresentations, there the conduct involved *pricing* and was clearly the sort of activity Congress sought to regulate. The Kroger Co. was a multi-billion dollar enterprise trying to use its superior buy-

1. Von Kalinowski, Antitrust Laws and Trade Regulation, Vol. 3 § 22.02 at 22-58. See also Automatic Canteen Co. v. F. T. C., 346 U.S. 61, 65, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953).

ing power to obtain anti-competitive prices.

■ Salta, nevertheless, urges that any fraudulent procurement of monies from a seller is tantamount to inducing a *price discrimination* forbidden by Clayton 2(f). "Price" is not defined by the Act and Salta maintains that "price" is to be determined by the amount the seller *actually* and *ultimately* receives from the sale, *i.e.*, net receipts rather than the money initially paid out by the buyer for the product. Salta reasons that as General Motors received less from Kapiolani, because of Kapiolani's allegedly fraudulent warranty claims, on a "net" basis than it received from Salta for similar automobiles there has been a price discrimination. Unfortunately for Salta, the decisions do not support Salta's "net receipts" formula, but rather hold that "price" means the actual amount paid to the supplier *for goods* furnished.[2]

■ In calculating the price a buyer actually pays, the courts deduct from the base price or invoice price the amount or value of any discounts or offsets knowingly granted to a buyer. It is only in theory that monies returned on warranty claims, etc., might be termed offsets. If, however, there were no such claims, no offset to the "price" could possibly occur, nor could the warranty refund potential ever have any direct connection with invoice price. Discounts and offsets which have been held violative of Clayton § 2 usually involve (1) quantity discounts, (2) cash discounts based on time or mode of payment or "off the

top", or (3) rebates,[3] all knowingly given by the supplier. All such obviously affect the *"price"* and were clearly in the mind of Congress when they enacted the Robinson-Patman Act.

■ While *Kroger* found a § 2(f) violation in Kroger's fraudulent inducement of a price discrimination, *Kroger*, however, does not stand for the bald proposition that any fraud upon a supplier which may put money into a buyer's pocket constitutes an inducement of a price discrimination condemned by § 2(f). As indicated above, in *Kroger* the defendant deliberately "induced" a *price discrimination* in the Act's sense of the words, knowing that the *price* it was inducing was discriminatory and far below the figure being quoted to other buyers similarly situated. It is only by an unwarranted extension of the meaning of the word that one could find that Kapiolani's allegedly fraudulent claims amounted to an *"inducement"*. Rather, the conduct charged here states a prima facie case of obtaining money by false pretenses, fraud, conversion and the like, but definitely not a case of *"inducing* a price discrimination." Where the conduct in *Kroger* was specifically calculated to affect "price" as that term has been defined under the Robinson-Patman Act, *i.e.*, amount buyer actually pays for an item, here the alleged conduct has nothing to do with "price", as either General Motors or Kapiolani viewed the term.

Kapiolani Motors' motion for summary judgment is granted.

2. *Cf.* Corn Products Refining Co. v. F. T. C., 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945); Von Kalinowski, op. cit. *supra* note 1, Vol. 4 § 27.03 at 27–23.

3. Von Kalinowski, op. cit. *supra* note 2, at 27–45.