FEDERAL TRADE COMMISSION, Petitioner,

v.

HUNT FOODS AND INDUSTRIES, INC., Respondent.

No. 732-59.

United States District Court
S. D. California,
Central Division.

Oct. 27, 1959.

**450**

Alan B. Hobbes, and Carleton A. Harkrader, Washington, D. C., Gary B. Lovell, Los Angeles, Cal., for petitioner.

Cushing, Cullinan, Duniway & Gorrill, by Ben C. Duniway, Vincent Cullinan, and Eustace Cullinan, San Francisco, Cal., Herbert S. Herlands, Fullerton, Cal., for respondent.

YANKWICH, District Judge.

The Federal Trade Commission,[1] petitioner herein, to be referred to as "The Commission", has been investigating certain practices in interstate commerce of the respondent, Hunt Foods and Industries, Inc., to be referred to as "Hunt", a California corporation with offices at Fullerton, Orange County, California, within this district, and engaged in interstate commerce. The object of the investigation is to determine whether Hunt or its predecessors,

> "in connection with the offering for sale, sale and distribution of processed tomato products, by selling such products at unreasonably low

prices with the purpose or intent of eliminating competition, have violated Section 5 of the Federal Trade Commission Act [15 U.S.C.A. § 45], or by selling such products to different customers at discriminatory prices and by affording customers payments or compensations for facilities or services rendered in connection with the sale of such products not afforded competing purchasers on proportionally equal terms, have violated Section 2(a) and 2(d) of the Clayton Act [15 U.S.C.A. § 13(a, d)]."

In the course of its investigation and pursuant to the congressional authority of the Commission[2] it issued its subpoena *duces tecum*, directed to Hunt and signed by Sigurd Anderson, one of the Commissioners, on April 28, 1959, informing Hunt of the matter and scope of the investigation and directing Hunt to appear on June 16, 1959, at 10 o'clock A.M., at 1747 West Commonwealth Avenue, Fullerton, California, before George W. Elliott or Ralph C. Wilmot, Jr., Attorney-Examiners of the Federal Trade Commission, and produce certain documentary evidence in connection with the investigation described in the subpoena.

The subpoena specifically set forth the scope of the investigation as given above. The documents to be produced were described in certain specifications numbered one to four attached to the subpoena, which are reproduced in the margin.[3]

---

1. 15 U.S.C A. § 41.

2. 15 U.S.C.A. § 49.

3. "Specifications

"1. (a) All records and documents (including but not limited to customer purchase orders, contracts of sale, sales, shipping and pre-billing invoices, customer claims, credit memoranda, cancelled checks or vouchers, memorandum billings, cash disbursements journals and cash receipts journals) pertaining to each transaction in which there has been a payment, allowance, credit or the giving of something of value (by way of cooperative advertising, promotional assistance, sales or shipping stimulation, settlement of customer claims or otherwise) to customers or customers of customers in connection with the sale and distribution by the company, its predecessors and subsidiaries of all brands of proc-

The subpoena was served by registered mail and was received by Hunt on May 5, 1959. On June 16, 1959, George W. Elliott, Attorney-Examiner of the Commission, convened a hearing for the purpose of receiving the testimony and docu-essed tomato products from July 1, 1956, to the return date of this subpoena within the following company sales districts:

| Hunt | Snider |
|------|--------|
| 2 | 10 |
| 3 | 31 |
| 5 | |
| 27 | |
| 13 | |
| 15 | |
| 35 | |
| 36 | |

"(b). Like records and documents for the same period of time with respect to sales made in the territories served by the brokers listed below, or their predecessors or successors:

| Hunt | Snider |
|------|--------|
| Herbert K. Astman Co. | Bjorkquist Brokerage Co. |
| Davis Brokerage Co. | Paul Brierre's Sons |
| Fuller Gay Company | C. R. Caldwell Sons |
| Green Brothers, Inc. | Chaimson & Robinson |
| Marks & Georgens, Inc. | Lindgren Brokerage Co. |
| Miller-Hall-Hopkins | Mattlage Sales, Inc. |
| Norton-Chadwick Co. | Pohn & Brinkman |
| C. C. Richardson Co. | Quesenberry & Catlin Co. |
| Howard Schoenberg | Howard Schoenberg |
| Seavey & Florsheim, Minneapolis | Taft and Co., Inc. |
| Paul Sayres Co., Inc. | Tatum Brokerage Co. |
| | Griffith P. Terry Co. |
| | W. G. Warnock Co. |
| | Lee Wilson Co. |

"(c) Like records and documents for the same period of time with respect to sales made anywhere within the United States to the customers listed below:

| | |
|------|------|
| American Stores | Grand Union Stores |
| The Great A & P Co. | The Kroger Company |
| The Colonial Stores | National Tea Company |
| Food Fair Stores | Red Owl Stores |
| Giant Food Stores | The Winn Dixie Stores |

"2. Alternatively, in lieu of specification 1, verified schedules showing the amount, nature and character of each such payment, allowance or credit, identifying the transaction and the customer or customer's customer involved, and showing in each instance the product, quantity, brand, size, unit, billing price and total amount billed.

"3. All literature, forms, schedules, bulletins, and informative material used by the company, its predecessors and subsidiaries in any way to apprize salesmen, sales representatives, brokers, customers, and the trade as to the nature, details, and mechanics of regular and special cooperative advertising, promotional assistance, or sales stimulation programs, schemes, plans, or offers related in any way to the distribution or sale of processed tomato products used or offered by the company, its predecessors and subsidiaries within the United States at any time during the period July 1, 1956, to the date of this subpoena.

"4. Copies of all advertising contracts, expense vouchers and other records disclosing all expenditures for advertising, direct or indirect, by the company, its predecessors and subsidiaries from Dec. 1, 1955 to the return date of this subpoena, together with all other records or documents (including but not limited to a copy of each printed advertisement and each radio and television script) disclosing the exact nature of each advertisement and the particular product or products advertised in each instance."

mentary evidence called for by the subpoena. A reporter's transcript of the brief proceedings shows that, after the Examiner opened the proceedings, Mr. Joseph R. Harmon, the secretary of Hunt, was introduced, as was also Herbert S. Herlands, attorney for Hunt.

Mr. Harmon, in answer to a question by the Examiner, stated that he was authorized by Hunt to respond to the requests contained in the subpoena. The following colloquy then occurred:

"Mr. Elliott: Mr. Harmon, what books, papers or documents or other material are you producing at this time and place in response to such request?

"Mr. Harmon: On behalf of Hunt Foods, an Industry, Inc., you are hereby advised that that company upon advice of counsel, *declines to comply with the subpoena issued by the Federal Trade Commission under date of April 28, 1959, and addressed to Hunt Foods, an Industry, Inc.*

"Mr. Elliott: Mr. Harmon, Have you anything further to say or produce in response to the subpoena?

"Mr. Harmon: *Nothing further.*" (Emphasis added)

The Examiner then adjourned the proceedings. Later the Commission instituted this action to enforce the subpoena[4] by the filing, in this Court, of a petition, the substance of which has been summarized above.

Although at the time of the hearing Hunt did not raise any specific objections, in their answer they challenge the power of the Commission to issue the subpoena, attack the constitutionality of Section 3 of the Robinson-Patman Act,[5] which they claim the Commission is seeking to enforce, and allege invalidity of the subpoena and of the action of the Commission on other grounds to be referred to hereafter.

A lengthy affidavit also sets forth why compliance with the subpoena would impose an unnecessary burden upon Hunt.

## I

### The Scope of the Subpoena

We dispose of the question of burdensomeness of the subpoena by adverting to the fact that, at the hearing of the matter, the Commission indicated that the scope of the subpoena is not so broad as Hunt thought. It was then suggested by the Court that the Commission file a statement with the Court indicating the limited scope of the inquiry they proposed to conduct so as to allay, as it were, Hunt's fears. Such a statement was filed and counsel for the Commission state in the final memorandum filed in the case that the Commission

"is willing to accept (it) as a binding limitation on it."

In substance, they agree to return to the place where the records are kept during ordinary business hours, limit the number of Commission representatives to three and agree that the Commission representatives will perform the physical work of removing the documents from the files and making copies thereof or notes about them. They will "sample" the documents specified rather than examine all. Hunt will be permitted to observe the Commission representatives at every stage, requiring their only assistance in locating the files containing the specific documents. Photostatic reproductions will be made at the Commission's expense. The stipulation also limits to 760 man hours the time which the Commission representatives will remain at the respondent's place of business.

In brief, the Commission, by this method, gives assurance to the Court that it will observe the protective restraints which, at times, are imposed by courts in the conduct of depositions,[6] interroga-

---

4. 15 U.S.C.A. § 49.

5. 15 U.S.C.A. § 13a.

6. Rules 26(b), 30(b) Federal Rules of Civil Procedure, 28 U.S.C.A.

tories,[7] and inspection of documents.[8] This being so we need not consider the abstract question raised by Hunt whether the Commission's statement *is, or is not*, a modification of the subpoena. For, concededly, it is an assurance given to the Court by counsel for the Commission, who instituted the action on its behalf, that the restraint and limitation expressed in the statement will be observed in the investigation.

As the Court retains jurisdiction of this matter and will be available to determine any dispute as to any order of compliance to be issued, Hunt *will be protected* against any oppressive or illegal use of the subpoena power, should any be attempted.

## II

### The Validity of the Subpoena

■ In truth, it is quite evident that Hunt believes that the entire investigatory proceeding of the Commission lacks validity and would have us so limit this power of inquiry as to do violence to the letter and spirit of the Federal Trade Commission Act under which this action is instituted and the decisions which have interpreted it. At this late date there can be no serious question as to the power of the Federal Trade Commission (and other regulatory commissions) to *precede their complaints* by an investigation to determine whether the facts exist warranting the issuance of a complaint.

Indeed, the public is protected when a complaint is preceded by an investigation aimed to determine whether there is "reason to believe" that acts have been committed in violation of law, and, if so, whether they are of a character which is within the jurisdiction of a particular commission. And the courts have uniformly sustained the reasonable exercise of such investigatory powers.[9]

The reason is well stated in one of the cases involving the Federal Trade Commission:

> "The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so." [10]

Such an investigation does not involve any question or unreasonable search and seizure, as is argued in the present case. When a similar contention was made in a National Labor Relations case, the answer given by the Supreme Court through Mr. Justice Rutledge was emphatic:

> "*What petitioners seek is not to prevent an unlawful search and seizure. It is rather a total immunity to the Act's provisions*, applicable to all others similarly situated, requiring them to submit their pertinent records for the Administrator's inspection under every judicial safeguard, after and only after

---

7. Rule 33, Federal Rules of Civil Procedure.

8. Rule 34, Federal Rules of Civil Procedure.

9. United States v. Morton Salt Co., 1950, 338 U.S. 632, 642–643, 70 S.Ct. 357, 94 L.Ed. 401; Oklahoma Press Publishing Co. v. Walling, 1946, 327 U.S. 186, 208–214, 66 S.Ct. 494, 90 L.Ed. 614; Automatic Canteen Co. of America v. Federal Trade Commission, 1953, 346 U.S. 61, 77–79, 73 S.Ct. 1017, 97 L.Ed. 1454; See, Bowles v. Abendroth, 9 Cir., 1945, 151 F.2d 407; Detweiler Bros., Inc. v. Walling, 9 Cir., 1946, 157 F.2d 841, 842–843; Durkin v. Fisher, 7 Cir., 1953, 204 F.2d 930, 932; Woerth v. United States, 8 Cir., 1956, 231 F.2d 822, 824–825; Menzies v. Federal Trade Commission, 4 Cir.,

1957, 242 F.2d 81, 82–84; Federal Trade Commission v. Waltham Watch Co., D.C. N.Y.1959, 169 F.Supp. 614, 616–619. Indeed, if we denied,

> "its broad power of investigation and subpoena, prior to the filing of a complaint," (Automatic Canteen Co. of America v. Federal Trade Commission, supra, 346 U.S. at page 79, 73 S.Ct. at page 1027).

the Federal Trade Commission's adjudicative powers would become illusory, as Judge Knox stated clearly in an early case. See, Federal Trade Commission v. Smith, D.C.N.Y.1929, 34 F.2d 323, 325.

10. United States v. Morton Salt Co., supra, note 9, 338 U.S. at page 642, 70 S. Ct. at page 364.

an order of court made pursuant to and in exact compliance with authority granted by Congress."[11] (Emphasis added.)

In the case before us the statute grants to the Commission the power to prevent unfair methods of competition and to prohibit them by order to desist.[12] In pursuit of these objectives, full investigatory powers are given as to individuals and corporations engaged in commerce.[13]

### III

### Constitutionality of the Robinson-Patman Act

There is no merit to the contention that under the guise of investigating alleged violation of the antitrust laws an attempt is being made by the Commission to enforce Section 3 of the Robinson-Patman Act.[14] I am aware of the limitations which the Supreme Court last year placed upon this Act.[15] But its decision merely limited the scope of the Act by denying the right to institute, under it, a *private treble damage action.* It *did not* intend to limit the scope of the Act as to its public enforcement or that of Section 3 as a regulatory penal statute. Indeed, the Court, while not passing on the constitutionality of the provision of the Act relating to violations of the "unreasonably low price" provision of Section 3, expressed no doubts about the validity of the regulatory and penal phases of that provision.[16] That case and a subsequent decision of the Supreme Court condemned price discrimination against one person as violative of the antitrust law.[17] Other decisions have consistently condemned price fixing as unreasonable *per se.*[18]

So it is reasonable to assume that the type of price discrimination which the Commission was investigating in the case before us involved what *might,* upon proof, develop to be an unfair method of competition, which it is the explicit function of the Commission to *investigate, prevent and prohibit.*[19]

11. Oklahoma Press Publishing Co. v. Walling, supra, note 9, 327 U.S. at page 196, 66 S.Ct. 494, 498. See, Menzies v. Federal Trade Commission, supra note 9, 242 F.2d at page 84; Federal Trade Commission v. Tuttle, 2 Cir., 1957, 244 F.2d 605, 614–615.

12. 15 U.S.C.A. § 45(a) and (b). See, Federal Trade Commission v. Cement Institute, 1948, 333 U.S. 683, 689–693, 68 S.Ct. 793, 92 L.Ed. 1009; Federal Trade Commission v. Reed, 7 Cir., 1957, 243 F. 2d 308, 309; Federal Trade Commission v. Tuttle, supra, note 11, 244 F.2d at pages 610–616.

13. 15 U.S.C.A. § 46(a) and (b).

14. 15 U.S.C.A. § 13a.

15. Nashville Milk Co. v. Carnation Co., 1958, 355 U.S. 373, 78 S.Ct. 352, 2 L. Ed.2d 340.

16. In fact, the contrary may be inferred from the language of the court. See, Nashville Milk Co. v. Carnation Co., supra, note 15, 355 U.S. at pages 378–380, 78 S.Ct. 352.

17. Klor's, Inc. v. Broadway-Hale Stores, 1959, 359 U.S. 207, 212–213, 79 S.Ct. 705, 3 L.Ed.2d 741. See, Federal Trade Commission v. Beech-Nut Packing Co., 1922, 257 U.S. 441, 454, 42 S.Ct. 150, 66 L.Ed. 307.

"The purpose of the antitrust laws is to protect the interstate market from illegal restraints. *If such restraints are applied to one person in the interstate market, then free competition is hurt and damaged."* (Richfield Oil Corporation v. Karseal Corporation, 9 Cir., 271 F.2d 709 (Emphasis added).

18. United States v. Socony-Vacuum Oil Co., Inc., 1940, 310 U.S. 150, 210, 60 S. Ct. 811, 84 L.Ed. 1129; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 1951, 340 U.S. 211, 214–215, 71 S.Ct. 259, 95 L.Ed. 219; Northern Pacific Railway Co. v. United States, 1958, 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed.2d 545. This has been the traditional attitude of our courts. See the writer's article, Competition, Real or Soft?, 1953, 14 F.R.D. 199, 207–209.

19. 15 U.S.C.A. § 45. Price discrimination to injure a competitor is a violation of the antitrust laws. Moore v. Mead Service Co., 10 Cir., 1951, 190 F.2d 540, 541–542. See, Moore v. Mead's Fine Bread Co., 1954, 348 U.S. 115, 118–120, 75 S. Ct. 148, 99 L.Ed. 145.

Section 5 of the Federal Trade Commission Act (15 U.S.C.A. § 45) "empowers and directs" the Commission to prevent the use of any "unfair method of competition * * * or unfair or de-

█ The fact that these practices may also be covered by the "unreasonably low price" provision of Section 3 of the Robinson-Patman Act presents no difficulty. For the cases just cited reenforce me in the conviction expressed years ago that that provision is not unconstitutional for vagueness.[20] And the Commission may declare conduct to be an "unfair" practice or "method of competition" and prohibit it although such conduct may also constitute a violation of the Sherman or Clayton Antitrust Acts, 15 U.S.C.A. § 1 et seq.[21]

█ This being so, the subpoena here involved must be held to have been issued in compliance with the investigatory powers of the Commission in order to determine whether a complaint should issue.[22] And the subpoena was properly made returnable before an Examiner.[23]

## Summary and Conclusion

What precedes and the added comments in the footnotes are sufficient answer to the contentions made by Hunt against the legality of the Commission's action. A more detailed discussion would merely be an elaboration of what is herein expressed, or no more than a repetition of the reasoning of the cases cited in the footnotes answering contentions similar to those made here, based, *in many instances*, on cases also cited here by Hunt.

Most of the cases pointing the other way are early cases in which the courts, faced with a newly created commission empowered to exercise great controls in order to keep our economy free and competitive, sought to restrict it. Whatever validity these cases had is attenuated by later decisions. Trial courts must accept this situation, i. e., we must be guided not by some expression of higher courts *in an old case,* but by their *latest* expressions in the field, whether there be ideally logical consistency or not between the two lines of thought. So we state the following conclusions on the objections made by Hunt:

The Commission has authority to issue the subpoena here involved under its extensive powers to investigate, prevent and prohibit unfair "practices" or "methods of competition" in commerce. The

ceptive acts or practices" in commerce. Selling at unreasonably low prices with the intent of eliminating competition is certainly an unfair method of competition. See, Moore v. Mead's Fine Bread Co., supra. The Commission should seek to eliminate such practice at its inception. For, as said in Federal Trade Commission v. Raladam Co., 1942, 316 U.S. 149, 152, 62 S.Ct. 966, 968, 86 L.Ed. 1336:

"One of the objects of the Act creating the Federal Trade Commission was *to prevent potential injury by stopping unfair methods of competition in their incipiency.*" (Emphasis added)

Section 2(a) of the Clayton Act, as modified by the Robinson-Patman Act (15 U.S.C.A. § 13(a)) declares that it is unlawful, under certain conditions, for a person engaged in commerce to "discriminate in price between different purchasers of commodities of like grade and quality."

Section 2(d) of the Clayton Act, as modified by the Robinson-Patman Act (15 U.S.C.A. § 13(d)) requires those who grant to some of their customers

allowances in connection with the sale of commodities in commerce to make such allowances "available on proportionately equal terms to all other customers."

20. F. & A. Ice Cream Co. v. Arden Farms Co., D.C.Cal.1951, 98 F.Supp. 180, 188–190. See Atlas Building Food Products Co. v. Diamond Block & Gravel Co., 10 Cir., 1959, 269 F.2d 950, 955.

21. Federal Trade Commission v. Cement Institute, supra, note 12, 338 U.S. at pages 690–693, 68 S.Ct. at page 800; Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 609, 73 S.Ct. 872, 97 L.Ed. 1277.

22. 15 U.S.C.A. § 49. See, Fashion Originators' Guild of America v. Federal Trade Commission, 1941, 312 U.S. 457, 463–466, 61 S.Ct. 703, 85 L.Ed. 949; Federal Trade Commission v. Cement Institute, supra, note 12.

23. Federal Trade Commission v. Hallmark, Inc., 7 Cir., 1959, 265 F.2d 433, 437–438; Federal Trade Commission v. Scientific Living, Inc., D.C.Pa.1957, 150 F.Supp. 495.

456

prohibition of discriminatory practices through sales at "unreasonably low prices" to favored customers is within these powers. The concept that unfair competition may arise from such discriminatory practices is a certain and valid standard.

■ The subpoena was properly made returnable before a hearing officer and was, under the statute and rules of practices of the Commission, properly served by mail upon one of Hunt's officers.[24]

■ And finally, in view of the nature of the investigation, the scope of the subpoena is not too broad or burdensome.[25]

On the whole subject, I agree with the conclusion reached by the Court of Appeals for the Second Circuit that:

"It was clearly the purpose of the Congress that the Commission should have adequate subpoena power to perform its duties."[26]

It follows that the petitioner is entitled to an Order enforcing the subpoena as prayed for in the Complaint. Formal findings and order fixing a new time for appearance to be prepared by counsel for the Government under Local Rule 7, West's Ann.Code.

24. 15 U.S.C.A. § 45(f); Rule § 1.35, 16 Code of Federal Regulations, 1959 Pocket Part, p. 11, 15 U.S.C.A. following section 45; Rule § 3.4(a) (1) (i), Ibid, p. 23. Menzies v. Federal Trade Commission, supra, note 9, 242 F.2d at pages 83–84.

25. See, United States v. American Locomotive Co., D.C.Ind.1946, 6 F.R.D. 35, 36–37; Kainz v. Anheuser-Busch, Inc., D.C.Ill.1954, 15 F.R.D. 242–247–249 (a private treble damage antitrust case in which extensive interrogatories requiring search of files were allowed).
The scope of the inquiry here is limited, both as to the subject matter and as to the persons dealt with. So are the documents relating to them sought by the subpoena. (See, Federal Trade Commission v. Hallmark, Inc., supra, note 23, 265 F.2d at page 439). They do not cover the broad range found not "relevant" in Federal Trade Commission

v. American Tobacco Co., 1924, 264 U.S. 298, 306–307, 44 S.Ct. 336, 68 L.Ed. 696, or of the type, the demand for which Judge McGohey found "unreasonable" In re Grand Jury Investigation (General Motors Corp.) D.C.N.Y.1959, 174 F. Supp. 393. Nor are they so "unrelated" to the proposed inquiry as I found the documents sought in Martin v. Chandis Securities Co., D.C.Cal.1940, 33 F.Supp. 478.

26. Federal Trade Commission v. Tuttle, supra, note 11, 244 F.2d at page 614. The legislative history confirms the view that the bills before the Congress creating the Commission intended to extend the subpoena power to any "investigation which may be undertaken" (House Report 533) in order that the Commission should have "extensive power of inquiry". (Senate Report 597, as both are quoted in Federal Trade Commission v. Tuttle, supra. 244 F.2d at pages 614–615).