543 P.2d 75 (1975)
The RAYMOND LEE ORGANIZATION, INC., a New York Corporation, Plaintiff-Appellant,
v.
SECURITIES COMMISSION of the State of Colorado et al., Defendants-Appellees.
No. 74-480.
Colorado Court of Appeals, Div. I.
September 16, 1975.
Rehearing Denied October 23, 1975.
Certiorari Granted December 22, 1975.
*77 Omer L. Griffin, Denver, Samuel N. Greenspoon, Eaton, Van Winkle & Green-spoon, New York City, for plaintiff-appellant.
J. D. MacFarlane, Atty. Gen., Jean E. Dubofsky, Deputy Atty. Gen., Edward G. Donovan, Sol. Gen., Harry N. MacLean, First Asst. Atty. Gen., Denver, for defendants-appellees.
Selected for Official Publication.
BERMAN, Judge.
Appellant, the Raymond Lee Organization, Inc., appeals from a judgment dismissing its complaint filed under C.R.S. 1963, 125-1-22 (now § 11-51-121, C.R.S. 1973), against defendants, the State of Colorado Division of Securities, Stanley R. Hays, and William J. Anderson, the Commissioner and Deputy Commissioner thereof, respectively. Appellant sought to reverse a cease and desist order entered by defendants (Commission) on April 18, 1972, which directed the Raymond Lee Organization to cease selling various contracts, the Commission having found that the agreements or contracts constituted "securities" as defined in § 11-51-102(12), C.R.S.1973, and that the sales were being made without compliance with the licensing and registration requirements of § 11-51-104 and § 11-51-106, C.R.S.1973.
The administrative action was commenced on January 7, 1972, when the Commission issued an Order for Production of Documents and an Order to Show Cause, charging appellant to show cause why it should not be required to register the "securities" being offered for sale to the public. A hearing was held on February 23, 1972. On April 18, 1972, the Commission entered the cease and desist order referred to above, and the Raymond Lee Organization appealed to the district court. We affirm in part and reverse in part.

I.
The first issue presented on review is the appellant's contention that it was denied due process of law on two grounds: First, the Commission violated its own rules in the commencement of the administrative proceedings because no complaint was filed; and, second, the Order for Production of Documents was too broad and covered items over which the Commission had no jurisdiction.
The Securities Commissioner's regulations provide in relevant part:
"Rule 9. Complaints may be made to the Division for the purpose of investigation. . . or the issuance of `Show Cause' . . . or `Cease and Desist' orders.
9.20. The commissioner may require that such complaints be made in writing, verified under oath, and containing or setting forth a detailed statement of the specific facts and circumstances relating thereto . . . .
9.40. Upon completion [of the investigation]. . . the commissioner . . . may enter . . . an order for respondent to `cease and desist' such activities complained of, `show cause' why such order should not be entered, or instituting [sic] such other administrative procedure as provided under Rule 10.
. . . . .
10.03. INSTITUTION OF PROCEEDINGS shall be made by the filing with the Division a written complaint. . . or issuance of an order or notice. . . setting forth the facts or conduct warranting a . . . `show cause' or `cease and desist' order. . . ." (emphasis supplied)
Rules 9 and 9.20, by use of the word "may," make clear that written complaints are discretionary. There is no constitutional requirement that such a complaint be made prior to the commencement of an investigation. See F.T.C. v. Hunt Foods and Industries, Inc., 178 F.Supp. 448 (S.D.Cal.). The Show Cause Order and Order for Production of Documents were issued pursuant to the statutory authority *78 granted in §§ 11-51-118, 119 and 120, C.R.S.1973, and specifically stated that the Order "is in the public interest" as required by § 11-51-119. Also, the Show Cause Order informed the appellant that it could request a hearing, which it did.
Since the appellant requested the hearing, it is questionable whether Rule 10.03 is applicable, but, assuming arguendo that it is, that rule provides that proceedings need not be commenced by a complaint, but may be instituted by the issuance of an order setting forth the facts and conduct warranting a "show cause" order. The Show Cause Order informed the appellant that the Commission had concluded that it was engaged "in the offering of securities to the public in this state," in violation of the registration and licensing provisions of the Securities Act. Thus, we find the Order sufficiently set forth "facts and conduct" warranting a "show cause" order.
Further, as we noted, a hearing on the issue made by the Order to Show Cause was held at the request of appellant and opportunity to be heard was provided. Finally, in the appellant's letters to the Commission objecting to the jurisdiction of the Commission and requesting a hearing, it did not raise the issue that no complaint had been filed with the Commission. Had appellant pointed out this alleged deficiency at that time, the Commission would have had an opportunity to correct it, if correction was necessary. As a general principle, courts refuse to consider questions on judicial review that have not been urged before the agency. See 3 K. Davis, Administrative Law § 20.06. These letters and the appellant's Motion to Quash and supporting memorandum brief also demonstrate that appellant was fully aware of, and adequately prepared to argue, the merits of the issues. Thus, there was no error in the trial court's ruling that the appellant was not denied due process.
We also find to be without merit the appellant's allegation of a denial of due process because the Order for Production of Documents covered items over which the Commission had no jurisdiction.
First, we note that it is not disputed nor could it be, that there are sufficient minimal contacts by the appellant with this state to allow the Commission to obtain jurisdiction over the appellant. Giger v. District Court, Colo., 540 P.2d 329 (1975); Van Schaack & Co. v. District Court, Colo., 538 P.2d 425 (1975). As to the extent of the Order for Production of Documents, the Commission, acting pursuant to its statutory authority, requested information from the appellant regarding activities, contracts, and clients, whether occurring within or outside the state. Such Order was admittedly broad, but the Commission's power to enforce the Securities Act is equally broad. See § 11-51-120, C.R.S.1973. Furthermore, the Cease and Desist Order issued by the Commission did not purport to extend in any way to appellant's activities, contracts, and clients outside the state. Also, only at the investigatory stage did the Commission seek information about the out-of-state activities of appellant over which it could not regulate. Such an investigative procedure is permitted by the holding in Natural Gas Pipeline v. Slattery, 302 U.S. 300, 58 S.Ct. 199, 82 L.Ed. 276.
Hence, we find no violation of due process in the range of documents requested by the Commission for its investigative purposes.

II.
Appellant next contends that the Commission's findings of fact are not supported by competent, material, and substantial evidence. In this regard, appellant contends that this court has the authority to make a determination of the evidence and substitute its own judgment for that of the Commission's where there is no conflict in the testimony.
On review, if the findings of fact are supported by competent, material, and substantial evidence they are conclusive; if not, they are arbitrary and capricious *79 and amount to an abuse of discretion. See § 11-51-121(1)(a), C.R.S.1973; Banking Board v. Turner Industrial Bank, 165 Colo. 147, 437 P.2d 531. The cases cited by appellant do not set a different standard for review; the reversals of administrative actions therein were predicated upon the impropriety of the actions taken under the evidence submitted, not upon the absence of conflicting evidence.
The appellant is involved in the development, research, introduction, and marketing of new products, ideas, and inventions. Besides its general management, there are three departments: engineering, licensing, and marketing. Employees include engineers, persons experienced with new products and inventions, and marketing personnel. The appellant also employs outside contractors, mechanical draftsmen, patent attorneys, patent draftsmen, and illustrators who work with the appellant in the preparation and development of the inventions. The appellant is a New York corporation, and its employees work out of the New York office. The president, Raymond Lee, is the sole shareholder.
The appellant currently utilizes three different form agreements in its arrangements with inventors, the "Preliminary Product Research Agreement" (Preliminary Agreement), "Development of Invention Agreement" (Invention Agreement), and the "Product and Marketing Development Agreement" (Marketing Agreement). In the Preliminary Agreement, appellant, for a fee of $100, examines the inventor's proposal, classifies the proposal as to subject matter, researches the records of prior U.S. patents relating to the proposal, procures copies from the U.S. Patent Office of patents of related inventions, and prepares and presents the results of this investigation, including appellant's procedures for further action, to the inventor.
In the Invention Agreement, for a fee of $675 plus an assignment of a 20% interest in the invention, the appellant develops and refines the invention for the preparation of suitable illustrations, prepares formal patent drawings and original description (for the inventor to include in a patent application), prepares a sales letter and prospectus covering the general functions of the proposal, contacts prospective manufacturers to seek opportunities to negotiate the sale or licensing of the proposal, publicizes the invention in consumer and/or trade publications, and actively negotiates with manufacturers expressing an interest in the proposal.
The Marketing Agreement provides for essentially the same services as the Invention Agreement. This agreement requires a fee of $375 plus a 20% commission on any net proceeds received as the result of appellant's efforts.
The appellant's position is that the contracts are nonexclusive, the inventor retains control and is always the owner, and negotiations are made by him or are subject to his consent or rejection; however, the Commission found that this position "conflicts with economic realities and other factual matter deduced." The Commission based its findings on the testimony, the particular agreements involved, and the entire package, including promotional material and representations employed in the scheme.
The Invention Agreement and the Marketing Agreement emphasize to the inventor the prohibitive costs and considerable risk, delay, and inconvenience involved if the inventor were to attempt to do alone what the appellant will do for him. Raymond Lee, in his testimony before the Commission, emphasized the appellant's "complete effort" from the "basic inception of the proposal through its ultimate. . . marketing or licensing." Inventors are kept informed "when there is a necessity for it," but appellant doesn't make negative reports, and, in fact, if nothing were being done to pursue his product, the inventor would not be so advised. While an inventor can, theoretically, deal with anyone (subject to appellant's 20% interest), Lee testified, "we don't like it" and admitted it would be a "very poor *80 business decision." In a discussion of the services performed under the Marketing Agreement, Lee testified that the inventor did not participate in these services because they are performed by the appellant in New York.
Appellant emphasized at the hearing that replies from manufacturers were to go directly to the inventor. However, only the Marketing Agreement requires this by its terms and only upon the "initial manufacturer contract." (emphasis supplied) Furthermore, the inventor is asked to forward all such replies to appellant so it can proceed to deal with the manufacturer.
The Commission found contrary to appellant's assertion that the inventor does not always retain control because, under the agreements, he may accept or reject any licensing or sale negotiated by the appellant. The Invention Agreement and Marketing Agreement provide that appellant will "handle any negotiations" and "shall actively negotiate." Lee testified that the inventor "will know his best interests lie with giving us the opportunity to take up these negotiations," and "most of the time, 90 per cent of the time," the inventor requests appellant to handle the negotiations. He admitted that negotiation is essentially what the appellant performs. We conclude the Commission's findings as to the facts are supported by competent, material, and substantial evidence and the inferences to be drawn therefrom, and those findings are thus conclusive.
The appellant also objects to the finding that there has been "actual execution of contracts" in Colorado. However, whether the contracts are executed in Colorado or New York is irrelevant since the Colorado Securities Act expressly covers the solicitation of an offer to buy in this state, § 11-51-102(8) (b) and § 11-51-127(1), C.R.S.1973, and actual execution of a contract within the state is not essential to the exercise of jurisdiction over appellant. Dwyer v. District Court, Colo., 532 P.2d 725.
We have examined the other findings to which appellant objectsthat the payments have no relation to the value or degree of services to be performed, and that the appellant was evasive and reticentand find substantial evidence to support them.

III.
The third issue is whether the Preliminary Agreement, the Invention Agreement, and the Marketing Agreement are securities as defined in § 11-51-102(12), C.R.S.1973. The trial court affirmed the Commission's finding that the agreements were investment contracts and/or profit-sharing agreements within the statutory definition, requiring compliance with the licensing and registration provisions of § 11-51-104 and § 11-51-106, C.R.S.1973. We affirm as to the Invention Agreement and the Marketing Agreement, but reverse as to the Preliminary Agreement.
Section 11-51-102(12), C.R.S.1973, provides:
"`Security' means any . . . certificate of interest or participation in any profit-sharing agreement; . . . investment contract . . . ."
Appellant contends that the Commission erred as a matter of law because it ignored the provisions of C.R.S.1963, 125-2-1 et seq., repealed by Colo.Sess.Laws 1973, ch. 388, which provided in relevant part:
"Securities of the class known as investment contracts referred to in subsection (12) of section 125-1-12, shall comprise the following: All . . . instruments. . . issued or sold on the installment payment plan, where the receipts therefrom are loaned or invested, and whereby the owner or holder thereof is entitled to receive at some future time or times, fixed or indefinite, a sum or sums of moneys . . ., which securities are hereby referred to as investment contracts, shall be subject to all of the provisions of article 1 of this chapter relating to the registration of issuers or *81 salesmen of securities." C.R.S.1963, 125-2-1(1) (a). (emphasis supplied)
While the definition of investment contract in the quoted provision does refer to the definition of security in former C.R.S.1963, 125-1-12(12), now § 11-51-102(12), C.R.S.1973, we do not agree with appellant's position that the above definition restricted the definition in article 1 of the Securities Act for purposes of the application of the registration and licensing provisions of article 1.
A complete reading of former article 2 shows that it was directed at investment trust companies. By its terms, C.R.S.1963, 125-2-1(1)(a), defines a class of investment contracts and subjects that class to regulation as securities. This classification does not preclude other contracts from being construed as investment contracts in the event they fall within the statutory definition contained in § 11-51-102(12), C.R.S.1973. Also, C.R.S.1963, 125-2-1(1) (b), which requires a deposit as a condition of said registration, refers specifically to investment trust companies. We note further that in the only Colorado case dealing with the definition of investment contract, which arose before the repeal of article 2 of title 125, this court did not feel constrained by the definition therein. See Sauer v. Hays, Colo.App., 539 P.2d 1343 (1975). See also Andrews v. Blue, 489 F.2d 367 at p. 374, n. 7 (10th Cir.).
In determining if the three agreements utilized by appellant are investment contracts,
"`The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.'" Sauer v. Hays, supra.

And, in applying that test we are guided by several rules of construction. The definition of a security "embodies a flexible rather than a static principle." S.E.C. v. Howey, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244. "Form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564. Securities acts are remedial in nature and should be broadly construed to effectuate their purpose. Howey, supra; Tcherepnin, supra. The broad purpose is to prevent the exploitation of investors through full and fair disclosure relative to the issuance of securities. Sauer, supra; Tcherepnin, supra.
It cannot be contended that there is not an investment of money by inventors under the Invention Agreement and the Marketing Agreement. Both involve the payment of a fixed fee ($675 or $375) as well as the assignment of a 20% interest or payment of a 20% commission.
We also find the third element, "profits to come solely from the efforts of others," present under the Invention Agreement and the Marketing Agreement. By the principles announced in Sauer v. Hays, supra, the presence of this element is determined by resolving, on a functional basis, "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." S.E.C. v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476 (9th Cir.); cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53.
Appellant urges that this element is not met since the inventor must approve the illustrations prepared by the engineering department,[1] must sign the patent application, and must consent to any sale or licensing agreement. It also urges that any profits come from the licensee or manufacturer, and not from the appellant. We do not view the inventor's efforts as the "undeniably significant ones." It is, of course, true that the inventor must sign the patent application, but the appellant prepares the *82 formal patent specifications and final patent drawing.
Here, the "essential managerial efforts" are those contributed and performed by appellant. They are, in fact, the core of appellant's "sales pitch," which emphasizes to the inventor the prohibitive cost and considerable risk, delay and inconvenience which "informed inventors" avoid by signing up with the appellant. The appellant seeks to have the inventor rely on its knowledge in the invention development field. Based on these undisputed facts from documents before the Commission, "it is not inappropriate that promoters' offerings be judged as being what they [are] represented to be." S.E.C. v. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88.
Nor do we view the fact that any profits are paid by the licensee or manufacturer as negating this element. In Continental Marketing Corp. v. S.E.C., 387 F.2d 466 (10th Cir.), a similar argument was made but was rejected on the basis that, "[t]he more critical factor is the nature of the investor's participation in the enterprise." Continental Marketing, supra. We agree with this approach.
The final and more difficult problem is whether there is a "common enterprise." The appellant contends there is no common enterprise inasmuch as no one inventor has any interest in the invention or product of another inventor, the services performed by appellant vary with and are directed only to each inventor's product, and any profit to the inventor comes only from his invention.
To support its contention, appellant relies on Milnarik v. M-S Commodities, Inc., 457 F.2d 274 (7th Cir.). In Milnarik, the plaintiffs, as did other persons, deposited a sum of money with defendant in a discretionary trading account. The court found a common enterprise to be lacking because "the success or failure of those other contracts had no direct impact on the profitability of plaintiffs' contract." The investors were represented by a common agent, but they were not joint participants in the same investment enterprise and there was no pooling of funds.
This interpretation of "common enterprise" was expressly rejected as too stringent in S.E.C. v. Koscot Interplanetary, Inc., 497 F.2d 473 (5th Cir.). The court in Koscot did no more than follow the decision in S.E.C. v. Howey, supra, where the Supreme Court found that a common enterprise existed, even though profits were not pooled and each investor's income was independent of that of other investors. Instead, the Supreme Court emphasized that the feasibility and success of the enterprise, in attracting investors and realizing profits, rested upon the promoter's successful management, since "individual development. . . would seldom be economically feasible," and the investors lack the knowledge, skill, and equipment necessary to do it for themselves.
Here, the appellant's scheme functions as a common enterprise; it seeks to obtain the inventor's money and idea in return for a "complete effort" of invention development from the basic inception of the proposal through its ultimate marketing. The "sales pitch" stresses the inability of the inventor to do what the appellant will do for him and impresses upon him that "to obtain serious consideration by companies in the field and to maximize the opportunity for success, [the appellant's] wellplanned program should be initiated." And, as previously pointed out, if the inventor attempts to do this for himself, his path is obstructed by warnings of prohibitive cost and considerable risk should this be the inventor's desire.
Appellant emphasizes that the Invention Agreement and the Marketing Agreement are nonexclusive and offer no guarantees to the inventor. However, the Commission found, and we agree, that the nonexclusive nature conflicted with the economic realities of the scheme. Although the agreements offer no guarantee, the sale or licensing of the invention is inherently of a speculative nature, with the appellant seeking *83 to attract inventors by emphasizing that profits, if there are to be any, will come as a result of its efforts. See Howey, supra.
Since we affirm the trial court's decision that the Invention Agreement and the Marketing Agreement are investment contracts within the judicial definition, we find no need to determine whether they also constitute profit-sharing agreements or would constitute securities under a "risk capital" analysis. See Sauer v. Hays, supra.
However, we reverse the trial court's decision upholding the Commission's cease and desist order as to the Preliminary Agreement. This contract, in essence, provides for a patent search at a fixed fee. As the Commission in its finding concedes, it does not appear per se to be a security, and we hold that it is not. While it is used as a prelude to, and in conjunction with, the other contracts discussed above, these further contracts are not offered in every case; and when not so offered, only the patent search is contracted for.
Thus, the Preliminary Agreement is severable from the other contracts, and therefore we hold that appellant may offer this contract within the State of Colorado without compliance with the registration and licensing provisions of the Securities Act. Such a fragmented approach finds support in S.E.C. v. Koscot Interplanetary, Inc., supra; and S.E.C. v. Turner, supra.
That part of the judgment which determines that the "Development of Invention Agreement" and the "Product and Marketing Development Agreement" are securities is affirmed. The part of the judgment that determines that the "Preliminary Product Research Agreement" constitutes a security is reversed. The cause is remanded with directions to enter judgment consistent with the views expressed herein.
COYTE and ENOCH, JJ., concur.
NOTES
[1] Appellant concedes that inventor approval of illustrations occurs only under the Invention Agreement and not under the Marketing Agreement.